## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

CYNTHIA MELKI

    Plaintiff

v.

TOUFIC MELKI

    Defendant

Case No. 138142 FL

RECEIVED

APR 0 5 2019

Clerk of the Circuit Court
Montgomery County, Md.

### DEFENDANT'S MOTION TO ALTER OR AMEND

Comes now, the Defendant, TOUFIC MELKI, by and through his counsel Susan J. Rubin, moving this Honorable Court, pursuant to Maryland Rule 2-534, to Alter or Amend its March 26, 2019 Order, and for good cause states as follows:

1. This matter came before the Court (Callahan, J.) on October 29, 30, 31 and November 1, 2018 on Plaintiff's Second Amended Complaint for Absolute Divorce and for Other Relief (Docket Entry #390), and Defendant's Answer thereto (Docket Entry #401).

2. On March 26, 2019, this Court entered an Opinion and Order granting Plaintiff an absolute divorce from Defendant based on a one-year separation, ordering Defendant to pay Plaintiff indefinite alimony in the amount of $9,000 per month, ordering Defendant to pay Plaintiff child support in the amount of $4,556 per month, ordering Defendant to pay Plaintiff a monetary award in the amount of $400,000 no later than June 1, 2019, ordering Defendant to maintain health and dental insurance for the children and to pay their unreimbursed medical and dental expenses, ordering Defendant to pay Plaintiff $107,000 in attorneys' fees and costs no later than April 1, 2019, entering judgment in favor of Plaintiff and against Defendant in the amount of $15,000 previously ordered to be paid for Plaintiff's valuation expert, awarding Plaintiff use and possession of the marital home and family use personal property located at 8931 Edgewood Drive, Gaithersburg, MD 20877 for a period

1

of up to three years, ordering Defendant to pay Plaintiff $103,069 for her 20% ownership interest in Retina One, LLC no later than June 1, 2019 and ordering Defendant to pay Plaintiff $65,887 for her 25% ownership interest in Cynasa Holdings, LLC no later than June 1, 2019, among other things. (Docket Entries #441 & 442).

3. Defendant brings this Motion to Alter or Amend, pursuant to Maryland Rule 2-534,[1] first and foremost because this Court lacked jurisdiction to grant Plaintiff an absolute divorce from Defendant.

4. Defendant further asserts that the Court made certain legal errors with respect to the grant of a monetary award, the award of indefinite alimony, the award of child support, the award of attorneys' fees and costs, the order that Defendant be solely responsible for the children's unreimbursed medical and dental expenses and the orders that Defendant pay Plaintiff for her shares in two jointly owned companies.

## I.     The Circuit Court Lacked the Authority to Grant Plaintiff an Absolute Divorce from Defendant

On August 29, 2018, Defendant filed a Motion for Summary Judgment arguing that Maryland lacks jurisdiction over the dissolution of the parties' marriage. (Docket Entry #363). The Court orally denied that Motion on October 29, 2018 (Docket Entry #417) and granted Plaintiff an absolute divorce from Defendant on March 26, 2019. (Docket Entry #442). Defendant maintains that this Court did not have jurisdiction over the dissolution of his marriage and to award the Plaintiff relief incidental to the granting of such an award, in support thereof, states as follows:

---

[1] Maryland Rules 2-534 provides, in pertinent part:

> In an action decided by the court, on motion of any party filed within ten days after entry of judgment, the court may open the judgment to receive additional evidence, may amend its findings or its statement of reasons for the decision, may set forth additional findings or reasons, may enter new findings or new reasons, may amend the judgment, or may enter a new judgment. A motion to alter or amend a judgment may be joined with a motion for new trial.

## A.    The Circuit Court Lacked Jurisdiction to Grant Plaintiff an Absolute Divorce from Defendant

5.  The Parties are both Lebanese citizens who chose to be married in the Greek Orthodox faith in Lebanon, pursuant to the laws of the Greek Orthodox Church, prior to Plaintiff moving to the United States with Defendant. (Exhibit 1, October 30, 2018 Transcript at 157 & 159).

6.  Both parties to this case have maintained their Lebanese citizenship.  It was always the intention of the parties to return to Lebanon with their children.  (Exhibit 1, October 30, 2018 Transcript at 160).  Indeed, the parties purchased property in Lebanon, which they had planned to live in upon their return and Defendant sent money to an organization, Combat Blindness International, in order to open a free clinic Defendant would work at upon the family's return to Lebanon. (Exhibit 1, October 30, 2018 Transcript at 77 & 80-81).

7.  There are no civil marriages in Lebanon[2] and the parties were never married civilly in any jurisdiction. (Exhibit 2).    Likewise, there are no civil divorces in Lebanon, only religious ones. (Exhibit 1, October 30, 2018 Transcript at 159).   Additionally, as the Court is well aware, Common-law marriage is not recognized in Maryland and is not valid.    Cynthia Callahan & Thomas C. Ries, **Fader's Maryland Family Law** § 3–4(d) (6th ed. 2016).  The parties' marriage remains solely a religious one pursuant to the laws and doctrines dictated by the Lebanese Greek Orthodox Church. This is not a case where the parties' marriage is to be afforded full faith and credit or where the elements of marriage mirror the elements of marriage incident to a marriage entered into in Maryland. The parties, marriage, entered into by their choice under the laws of Lebanon, was of a

---

[2]     Pursuant to the U.S. Embassy in Lebanon: "All marriages in Lebanon are performed by a religious authority and are registered in the husband's jurisdiction of birth. Those wishing to have a civil marriage must marry outside the country. In cases of interfaith relationships, either partner can convert to the faith of the other for the purpose of marriage. https://lb.usembassy.gov/u-s-citizen-services/local-resources-of-u-s-citizens/marriage/

certain type. It was incapable of destruction by any authority based upon no fault types of grounds. The Court's efforts to grant a divorce, the Court's power or jurisdiction at least, terminated when the Plaintiff chose to proceed on grounds incompatible with the termination provisions incident to the marriage the parties entered into.

8. Pursuant to Lebanese law, the ecclesiastical courts have exclusive subject matter jurisdiction over the dissolution of marriages and *__Lebanon will not recognize a foreign civil divorce__*. (Exhibit 3 at 7).

9. Curiously, *__the parties will still be married in Lebanon__*.

**B. The Principals of Comity Require the Court to Vacate the Judgment of Absolute Divorce**

10. The parties' marriage is entitled to recognition by the State of Maryland pursuant to the doctrine of comity as it was valid according to Lebanese law. *Tshiani v. Tshiani*, 208 Md. App. 43, 52 (2012). Additionally, the type and circumstances of the marriage are not expressly prohibited by Maryland law and the marriage is not repugnant to Maryland public policy. *Port v. Cowan*, 426 Md. 435, 444-45, 44 A.3d 970, 976 (2012).

11. While Maryland courts "have recognized an exception to the application of *lex loci contractus* when application of a foreign jurisdiction's law would be contrary to a strong public policy of this State," that exception is not applicable to the case before this Court. See generally, *Bethlehem Steel v. G.C. Zarnas & Co.*, 304 Md. 183, 498 A.2d 605 (1985); *National Glass v. J.C. Penney*, 336 Md. 606, 650 A.2d 246 (1994).

12. Indeed,

> [M]erely because Maryland law is dissimilar to the law of another jurisdiction does not render the latter contrary to Maryland public policy and thus unenforceable in our courts. Rather, for another state's law to be unenforceable, there must be "a strong public policy against its enforcement in Maryland," *Texaco v. Vanden Bosche*, [] 242 Md. [334,] 340–341 [(1966)], or "a public policy sufficient to require the application

4

of law other than the law of the place of the [contract]," *Harford Mutual v. Bruchey*, []
248 Md. [669,] 676 [1968]).

*Bethlehem Steel Corp.*, 304 Md. at 189.

13. Having been married in the Greek Orthodox Church in Lebanon, the parties' marriage
contract included that neither could divorce the other absent:

1. If one of the spouses converted into another religion;

2. If one person tries to kill the other;

3. If one of them was sentenced to three years maximum of imprisonment
   for flagrant crime;

4. If one of the spouses has neglected the other one for more than three
   years, whether he/she was away from his/her residence or living in it
   and the tribunal has not succeeded to convince him/her to return to the
   matrimonial time, provided that the three years time limit shall start to
   run once one of the spouses inform official the Parish Priest or the
   Religious Chief of the arising conflict;

5. If the Tribunal officially sentenced the separation for three years
   maximum and the efforts deployed for conciliation and the returning of
   common life have not succeeded, provided that the prejudiced party
   files a new lawsuit;

6. If one of the spouses has intentionally refused, without the consent of
   the other, to procreate by any means or has abstained from sexual
   intercourse without justification or legitimate causes to be estimated by
   the tribunal; and

7. If one spouse commits adultery or what is considered as similar to
   adultery provided submitting an evidence thereto, stipulating that the
   Tribunal decides upon what is similar to adultery.

(Exhibit 3 at 4-5).

14. The Lebanese Greek Orthodox Church does not allow divorce on a no-fault basis.  (Exhibit 3
at 4-5 and Exhibit 4, November 1, 2018 Transcript at 28).  While Plaintiff went through the exercise
of amending her complaint to include a claim of adultery, that claim was withdrawn on the second

day of trial. (Exhibit 1, October 30, 2018 Transcript at 6).

15. In light of the terms of the parties' marriage contract and the fact that the parties always intended to return to Lebanon, including their decision to maintain their Lebanese citizenship, Lebanese law, not Maryland law, must be applied. Applying the laws of Lebanon and the Greek Orthodox Church in Lebanon at a minimum, the Circuit Court for Montgomery County cannot grant Plaintiff an absolute divorce from Defendant on the basis of a one-year separation.

### B. The Circuit Court's Grant of an Absolute Divorce is an Impermissible Interference with the Parties' Marriage Contract

16. The term "marriage" is not defined by the Annotated Code of Maryland, however, it is well-settled in Maryland that "marriage, irrespective of whatever other adventurous undertaking it may be, is also a contract." *Goldin v. Goldin*, 48 Md. App. 154, 162 (1981). The Circuit Court's grant of an absolute divorce based on a one-year separation impermissibly modified the parties' marriage contract, the implied termination provisions of which do not allow for no-fault divorce.

17. The terms of that marriage contract must be recognized by the State of Maryland. Indeed, pursuant to Maryland's conflict of law rules, "[a]bsent a choice-of-law provision in the contract, [Maryland] courts have applied the rule of *lex loci contractus* to matters regarding the validity and interpretation of contract provisions. *See Allstate [v. Hart]*, 327 Md. [526,] 529, [(1992)]; *Kramer [v. Bally's Park Place]*, 311 Md. [387,] 390 [(1988)]."

18. Parties have a fundamental right to contract, which precludes modification by a Court. *Chesapeake Bank of Maryland v. Monro Muffler/Brake, Inc.*, 166 Md. App. 695, 718, 891 A.2d 384, 398 (2006) (quoting *Grossman v. Grossman*, 234 Md. 139, 144 (1964)). Additionally, "Article I, § 10 of the U.S. Constitution provides that no State shall pass any law impairing the obligation of contracts." *Allstate Ins. Co. v. Kim*, 376 Md. 276, 298 (2003).

19. Maryland's no-fault divorce statute has modified the parties' marriage contract by

6

significantly expanding its termination provisions and, thereby significantly impaired the parties' marriage contract.

20. As set forth above, the Orthodox Church in Lebanon provides seven termination provisions for marriage contracts, none of which are on the grounds of no-fault. By granting Plaintiff an absolute divorce from Defendant on the basis of a one-year, no-fault, separation, the Court has expanded the termination provisions of the parties' marriage contract in a manner in direct contravention of Maryland's laws on contracts.

**D. The Court's Grant of an Absolute Divorce is in Violation of Defendant's First Amended Right to Freedom of Religion**

21. In modifying the parties' marriage contract to allow for a no-fault divorce, the Circuit Court has not only impermissibly infringed upon the parties' freedom to contract, but it has done so in a manner that has also violated Defendant's First Amendment right to freedom of religion.

22. Maryland has already recognized that restrictions on the right to marry can potentially infringe on one's First Amendment right to intimate association. *Cross v. Baltimore City Police Dep't*, 213 Md. App. 294, 308 (2013) (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 617–19 (1984)).

23. The Supreme Court has also recognized "that the right 'to marry, establish a home and bring up children' is a central part of the liberty protected by the Due Process Clause. . . ." *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). The right to remain married is clearly encompassed in that liberty as the Supreme Court has also "'long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment.'" *Zablocki*, 434 U.S. at 385 (quoting *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639–640 (1974)).

24. In this case, the Circuit Court's grant of a no-fault divorce has also infringed upon

Defendant's freedom of religion. As set forth previously, the Lebanese Greek Orthodox Church does not allow divorce based on no-fault.

25. Indeed, having been married in the Greek Orthodox Church in Lebanon, the parties' marriage contract included that neither could divorce the other absent:

1. If one of the spouses converted into another religion;

2. If one person tries to kill the other;

3. If one of them was sentenced to three years maximum of imprisonment for flagrant crime;

4. If one of the spouses has neglected the other one for more than three years, whether he/she was away from his/her residence or living in it and the tribunal has not succeeded to convince him/her to return to the matrimonial life, provided that the three years time limit shall start to run once one of the spouses inform official the Parish Priest or the Religious Chief of the arising conflict;

5. If the Tribunal officially sentenced the separation for three years maximum and the efforts deployed for conciliation and the returning of common life have not succeeded, provided that the prejudiced party files a new lawsuit;

6. If one of the spouses has intentionally refused, without the consent of the other, to procreate by any means or has abstained from sexual intercourse without justification or legitimate causes to be estimated by the tribunal; and

7. If one spouse commits adultery or what is considered as similar to adultery provided submitting an evidence thereto, stipulating that the Tribunal decides upon what is similar to adultery.

(Exhibit 3 at 4-5).

26. The Lebanese Greek Orthodox Church does not allow divorce on a no-fault basis and *__Lebanon will not recognize a foreign civil divorce__*. (Exhibit 3 at 7 and Exhibit 4, November 1, 2018 Transcript at 28).

27. Allowing Plaintiff to obtain a divorce from Defendant in a manner not allowed by their

Church would result in this Court forcing Defendant to commit a mortal sin according to his religious beliefs. (Exhibit 2).

28. Plaintiff is acutely aware of the fact that her religion does not allow divorce based on a no-fault ground. Indeed, as the divorce merits trial approached, Plaintiff filed a motion for leave to amend her complaint for the sole purpose of adding an adultery count. (Docket Entries #331, 268 & 390). Despite being allowed to amend her complaint as requested, Plaintiff withdrew the adultery count on the second day of trial, thereby divesting the Court of any arguable ability to grant Plaintiff a divorce. (Exhibit 1, October 30, 2018 Transcript at 6).

29. As set forth in Archdiocese of Washington v. Moersen, 399 Md. 637, 640–41, 925 A.2d 659, 660–61 (2007):

> The First Amendment, as relevant, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const., Am. I. These religious prohibitions are applied to the states through the Fourteenth Amendment. *Employment Div., Ore. Dept. of Human Res. v. Smith,* 494 U.S. 872, 876–77, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876, 884 (1990). *See also Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213, 1217–18 (1940); *Levitsky v. Levitsky,* 231 Md. 388, 396–97, 190 A.2d 621, 625 (1963); *Craig v. State,* 220 Md. 590, 599, 155 A.2d 684, 690 (1959). The free exercise clause prohibits government regulation of religious beliefs. *Wisconsin v. Yoder,* 406 U.S. 205, 219, 92 S.Ct. 1526, 1535, 32 L.Ed.2d 15, 27 (1972). Legitimate claims to free exercise, however, can be outweighed by government interests, albeit only those of the highest importance. *Yoder,* 406 U.S. at 214–15, 92 S.Ct. at 1532–33, 32 L.Ed.2d at 23–25.

> The free exercise protection is also present in Article 36 of the Declaration of Rights of the Maryland Constitution. It provides, as relevant, that:

>> "... all persons are equally entitled to protection in their religious liberty; wherefore, no person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice, unless, under the color of religion, he shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others in their natural, civil or religious rights; nor ought any person to be compelled to frequent, or maintain, or contribute, unless on contract, to maintain, any place of worship, or any ministry ..."

The Free Exercise Clause, as embodied in the U.S. Constitution and Article 36 of the Maryland Declaration of Rights, does not provide "a constitutional right to ignore neutral laws of general applicability," even when such laws have, as an incidental effect, the burdening of a particular religious activity, however. *City of Boerne v. Flores*, 521 U.S. 507, 513, 117 S.Ct. 2157, 2161, 138 L.Ed.2d 624, 634 (1997). *See also Church of the Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520, 531, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472, 489 (1993); *Employment Div., Ore. Dept. of Human Res.*, 494 U.S. at 892, 110 S.Ct. at 1607, 108 L.Ed.2d at 894; *Levitsky*, 231 Md. at 396–397, 190 A.2d at 625; *Craig*, 220 Md. at 599, 155 A.2d at 689.

Under the Free Exercise Clause, strict scrutiny is used to evaluate whether laws target religious practices or impose burdens, motivated by religious belief, on conduct. *Church of the Lukumi Babalu Aye*, 508 U.S. at 531–32, 113 S.Ct. at 2226, 124 L.Ed.2d at 489.

30. The Circuit Court's grant of a no-fault divorce would not have a mere "incidental" effect on Defendant's religious beliefs - - it would force him to commit a mortal sin according to his religion. Section 7-103(a)(4) of the Annotated Code of Maryland's Family Law Article inarguably is unconstitutional as applied to the instant case.

31. As established in *Montrose Christian Sch. Corp. v. Walsh*, 363 Md. 565, 586 (2001),

[U]nder the Free Exercise Clause, laws targeting particular religious practices, or selectively imposing burdens on conduct motivated by religious belief, are subject to strict scrutiny, and "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye v. Hialeah, supra*, 508 U.S. at 531–532, 113 S.Ct. at 2226, 124 L.Ed.2d at 489. Moreover, even laws which are neutral and generally applicable have "failed to pass constitutional muster" under the Free Exercise Clause when "other constitutional protections were at stake." *City of Boerne v. Flores, supra*, 521 U.S. at 513–514, 117 S.Ct. at 2161, 138 L.Ed.2d at 634.

32. In this case, there is no compelling governmental interest in allowing Plaintiff to obtain a no-fault divorce from Defendant when the parties specifically and deliberately chose to be married according to the laws and doctrines of the Lebanese Greek Orthodox Church. Having been married pursuant to laws that prohibit no-fault divorce, Defendant had a fundamental right to remain married absent the occurrence of one or more of the bases for a Lebanese Greek Orthodox divorce. The laws

of Lebanon and the religious beliefs of the parties are worthy of respect and the granting of a divorce overrides and destroys really any notion that the views of the country and Defendant are worthy of that respect.

## II.   Monetary Award

33. The Circuit Court ordered Defendant to pay a monetary award in the amount of $400,000 no later than June 1, 2019.  According to the Marital and Nonmarital Property Schedule issued by the Court (hereinafter, the Property Schedule"), however, it is apparent that Defendant does not have the ability to pay that monetary award while meeting the other obligations ordered in the Judgment of Absolute Divorce.

34. According to the Property Schedule, Defendant has liquid assets in the amount of $7,366 (Property Schedule Nos. 2(b), 4(b), 5 & 24).  In addition to the monetary award, however, Defendant has also been ordered to pay $107,000 in attorneys' fees and costs, $15,000 for Plaintiff's valuation expert, $103,069 for Plaintiff's 20% interest in Retina One, LLC and $65,887 for Plaintiff's 25% interest in Cynassa Holdings, LLC, alimony arrears of $15,000 and child support arrears of $22,780. Excluding his on-going alimony and child support obligations, the Court ordered Defendant to pay Plaintiff $728,736 by June 1, 2019.

35. While Defendant does have approximately $499,494 in his two Fidelity IRAs, he is only fifty-eight (58) years old.  If he liquidates those two accounts in order to pay his financial obligations, then he would be subject to penalties for early withdrawal on top of the income tax he would be required to pay on those funds.  Furthermore, even if he liquidated his Fidelity accounts, Defendant would still not have enough funds to pay his financial obligations under the Judgment of Absolute Divorce.

36. Defendant respectfully requests, therefore, that the Court vacate the monetary award.

37. Additionally, if the Court vacates the alimony award, the child support award or the attorneys'

11

fee award, the Court is similarly required to vacate the monetary award as the components of the same are intertwined and the Court is required to consider them in conjunction with one another. *St. Cyr v. St. Cyr*, 228 Md. App. 163, 198 (2016) ("a court's determinations as to alimony, child support, monetary awards, and counsel fees involve overlapping evaluations of the parties' financial circumstances. The factors underlying such awards 'are so interrelated that, when a trial court considers a claim for any one of them, it must weigh the award of any other.' *Turner [v. Turner]*, 147 Md. App. [350,] 400 [(2002)]. 'Therefore, when this Court vacates one such award, we often vacate the remaining awards for reevaluation.' Id. at 401, 809 A.2d 18 (collecting cases); *see also Hiltz [v. Hiltz]*, 213 Md. App. [317,] 322 n. 3 [(2013)] (citing *Doser [v. Doser]*, 106 Md. App. [329,] 335[(1995)]; *Murray v. Murray*, 190 Md. App. 553, 572, 989 A.2d 771 (2010))".

## III.    Indefinite Alimony

38. In addition to his belief that this Court has no jurisdiction over the parties' divorce, Defendant also contends that even if this Court had jurisdiction, the Court erred and abused its discretion in awarding $9,000 per month in indefinite alimony.

39. Plaintiff's financial statement asserts that she has total monthly expenses for herself and the children of $7,592, including $2,671 in rent that she would no longer have to pay under the award fashioned. Subtracting the rent brings her total monthly expenses to $4,921.

40. Pursuant to the Judgment of Absolute Divorce, Plaintiff was awarded use and possession of the marital home. This Court determined that the expenses for that home are $9,320 after subtracting "the nanny, the undifferentiated support, the Key Boulevard apartment, the private school costs, the health insurance for Husband and the children, and the other mortgage payments on Husband's financial statement not associated with the Edgewood home." The Court does not, however, explain how it arrived at the figure, despite citing to Defendant's Financial Statement.    A review of

12

Defendant's Financial Statement reveals that the costs associated with the Edgewood home (Section A.) are only $4,376 after subtraction of the nanny expense (the only expense enumerated by the Court that is found in Section A).

41. Additionally, the figure for the Edgewood home expenses includes home equity line payments in the amount of $1,953 per month. (Exhibit 4, November 1, 2018 Transcript at 105). Defendant is the sole obligor on the home equity line and, therefore, is the one responsible for payment of that debt on the marital home. (Exhibit 4, November 1, 2018 Transcript at 57-58). Furthermore, there is no direction in the Judgment of Absolute Divorce regarding who is responsible for the utilities and other associated costs, including the line of credit, of the marital home during the use and possession period.

42. Plaintiff's true expenses for the marital home,[3] therefore, would be no more than $7,367.

43. Using the correct expense figures for Plaintiff, and assuming that Plaintiff will be responsible for paying the line of credit and the utilities associated with the marital home, results in a total potential need (including for the children) of $9,297. The combination of alimony and child support awarded by the Court, however, results in payments of $13,556 despite the imputation of $2,500 per month in income to Plaintiff.

44. Defendant also asks the Court to reconsider the award of alimony for an indefinite period. This was a very short-term marriage, with the parties only living together for approximately seven (7) years. (Docket Entry #442 at 18). Additionally, Plaintiff is only thirty-five (35) years old. (Docket Entry #442 at 18). At such a young age, Plaintiff will surely be able to become self-supporting.

45. Maryland Courts have consistently held that

---

[3] Furthermore, if the use and possession award is vacated as requested by Defendant, then Plaintiff's expenses would be substantially less.

"[T]he purpose of alimony is not to provide a lifetime pension, but where practicable to ease the transition for the parties from the joint married state to their new status as single people living apart and independently. Expressed otherwise, alimony's purpose is 'to provide an opportunity for the recipient spouse to become self-supporting.' The concept of alimony as life-long support enabling the dependent spouse to maintain an accustomed standard of living has largely been superseded by the view that the dependent spouse should be required to become self-supporting, even though that might result in a reduced standard of living."

*Doser v. Doser*, 106 Md. App. 329, 352 (1995) (quoting *Tracey v. Tracey*, 328 Md. 380, 391 (1992)).

46. Even though Plaintiff may never earn as much as Defendant, to whom she was married for only seven (7) years, that does not mean that she cannot become self-supporting.

47. Additionally, if the Court vacates the child support award, the monetary award or the attorneys' fee award, the Court is similarly required to vacate the alimony award as the components of the same are intertwined and the Court is required to consider them in conjunction with one another. *St. Cyr v. St. Cyr*, 228 Md. App. 163, 198 (2016) ("a court's determinations as to alimony, child support, monetary awards, and counsel fees involve overlapping evaluations of the parties' financial circumstances. The factors underlying such awards 'are so interrelated that, when a trial court considers a claim for any one of them, it must weigh the award of any other.' *Turner [v. Turner]*, 147 Md. App. [350,] 400 [(2002)]. 'Therefore, when this Court vacates one such award, we often vacate the remaining awards for reevaluation.' Id. at 401, 809 A.2d 18 (collecting cases); *see also Hiltz [v. Hiltz]*, 213 Md. App. [317,] 322 n. 3 [(2013)] (citing *Doser [v. Doser]*, 106 Md. App. [329,] 335[(1995)]; *Murray v. Murray*, 190 Md. App. 553, 572, 989 A.2d 771 (2010))".

## IV.    Child Support

48. The Court ordered Defendant to pay $4,556 per month in child support.  The Child Support Guidelines completed by the Court, however, does not take into account Defendant's payment of the

children's tuition or his payments for work-related childcare (his nanny).

49. Adding those costs and using the rest of the numbers inputed by the Court, results in a child support obligation of $2,665. (Exhibit 5).

50. Additionally, if the Court vacates the alimony award, the monetary award or the attorneys' fee award, the Court is similarly required to vacate the child support award as the components of the same are intertwined and the Court is required to consider them in conjunction with one another. *St. Cyr v. St. Cyr*, 228 Md. App. 163, 198 (2016) ("a court's determinations as to alimony, child support, monetary awards, and counsel fees involve overlapping evaluations of the parties' financial circumstances. The factors underlying such awards 'are so interrelated that, when a trial court considers a claim for any one of them, it must weigh the award of any other.' *Turner [v. Turner]*, 147 Md. App. [350,] 400 [(2002)]. 'Therefore, when this Court vacates one such award, we often vacate the remaining awards for reevaluation.' Id. at 401, 809 A.2d 18 (collecting cases); *see also Hiltz [v. Hiltz]*, 213 Md. App. [317,] 322 n. 3 [(2013)] (citing *Doser [v. Doser]*, 106 Md. App. [329,] 335[(1995)]; *Murray v. Murray*, 190 Md. App. 553, 572, 989 A.2d 771 (2010))".

## V.   The Children's Unreimbursed Medical and Dental Expenses

51. The Court ordered Defendant to pay all of the children's unreimbursed medical and dental expenses.

52. Pursuant to § 12-204(h)(2) of the Annotated Code of Maryland's Family Law Article (hereinafter, "F.L."), however, "[a]ny extraordinary medical expenses incurred on behalf of a child shall be added to the basic child support obligation and shall be divided between the parents in proportion to their adjusted actual incomes."

53. "Extraordinary medical expenses" is defined by F.L. § 12-201(g) as:

> (g)(1) "Extraordinary medical expenses" means uninsured expenses over $100 for a single illness or condition.

(2) "Extraordinary medical expenses" includes uninsured, reasonable, and necessary costs for orthodontia, dental treatment, asthma treatment, physical therapy, treatment for any chronic health problem, and professional counseling or psychiatric therapy for diagnosed mental disorders.

54. Defendant, therefore, requests that this Court alter or amend the Judgment of Absolute Divorce to provide that the parties will share the children's unreimbursed medical and dental expenses in proportion to their incomes.

## VI.   Transfer of Ownership Interests

55. As part of the Judgment of Absolute Divorce, the Court ordered Defendant to pay Plaintiff $103,069 for her 20% ownership interest in Retina One, LLC and to pay Plaintiff $65,887 for her 25% ownership interest in Cynasa Holdings, LLC.   This, however, constitutes an impermissible transfer of title.

56. Pursuant to F.L. § 8-205(a)(2), the only property that the Court may transfer the ownership interest of is a pension, retirement, profit sharing, or deferred compensation plan, family use personal property or the family home:

(2) The court may transfer ownership of an interest in:

one    (i) a pension, retirement, profit sharing, or deferred compensation plan, from party to either or both parties;

from    (ii) subject to the consent of any lienholders, family use personal property, one or both parties to either or both parties; and

(iii) subject to the terms of any lien, real property jointly owned by the parties and used as the principal residence of the parties when they lived together, by:

1. ordering the transfer of ownership of the real property or any interest of one of the parties in the real property to the other party if the party to whom the real property is transferred obtains the release of the other party from any lien against the real property;

2. authorizing one party to purchase the interest of the other party in the real property, in accordance with the terms and conditions ordered by

the            court; or

    3. both.

57. The Judgment of Absolute Divorce must, therefore, be altered or amended to vacate the requirement that Defendant pay Plaintiff for her ownership interest in Retina One, LLC and Cynasa Holdings, LLC.

## VII.    Use and Possession

58. First and foremost, Plaintiff did not request use and possession in her Amended Complaint for Absolute Divorce and Other Relief either. (Docket Entry #268). While the Maryland Rules impose much more stringent requirements on pleadings than the requirements of federal notice pleading,[4] Plaintiff did not even make a bare bones request for use and possession in her pleadings. Plaintiff is not entitled to use and possession on that ground alone.

59. Prior to the parties' marriage, Defendant purchased real property located at 8931 Edgewood Drive, Gaithersburg, Maryland. Subsequent to the parties' marriage, the Edgewood Drive home became the marital home and Defendant changed title to himself and Plaintiff as tenants by the entireties. Since Plaintiff left the marital home nearly three (3) years ago, *Defendant* has resided in the marital home with the parties three (3) children when they are with him. Plaintiff has not lived in the marital home for almost three (3) years and, rather, has been living with the children at 120 Gibbs Street, Apartment 347, Rockville, Maryland 20850 that entire time.

60. The children have not resided in the marital home with Plaintiff in over three (3) years. There is no evidence, therefore, that it is in the children's best interest that they now reside in the marital home with Plaintiff as opposed to Defendant.

---

[4] *Shepter v. Johns Hopkins Univ.*, 334 Md. 82, 104 (1994) (citing P. Sandler & J. Archibald, *Pleading Causes of Action in Maryland* § 1.1, at 2 (1991) ("[T]here is a substantial difference between the requirements of federal notice pleading and the more stringent requirements of Maryland Rule 2–305.").

61. Furthermore, it is important to note that while Plaintiff did request use and possession at trial, she did not do so in her Second Amended Complaint for Absolute Divorce and Other Relief. (Docket Entry #390).

62. Finally, even if the Court declines to vacate the award of use and possession, Defendant asks that it be altered or amended to provide Defendant with a reasonable amount of time to move out of the marital home, where he has resided for eighteen (18) years. If the Court is not inclined to vacate the use and possession order, Defendant is requesting that he have ninety (90) days from the date of any new order within which to vacate the marital home.

## VIII.    Attorneys' Fees and Costs

63. The Court ordered that Defendant pay almost all of Plaintiff's attorneys' fees and costs ($107,000 of the $107,758 requested) on the basis that "[w]hile not all of [Defendant's] positions were without substantial justification, many were." (Docket Entry #442 at 24-25). As admitted by the Court however, not all of Defendant's positions were without substantial justification, yet he was required to pay the entire freight for Plaintiff's efforts to divorce him.

64. Clearly Defendant was entitled to prosecute and defend the claims relating to custody, access and child support. Equally clear is that even if Defendant is guilty of the actions ascribed to him by the Court, Plaintiff would have had to pay some amount of attorneys' fees for proceeding with her claims.

65. Finally, it must be noted that Plaintiff filed a motion for leave to file a second amended complaint for the sole purpose of adding a claim for adultery against Defendant. (Docket Entries #331, 268 & 390). The parties filed pleadings on the motion for leave and a hearing was held. (Docket Entries #331, 344 & 381). While Plaintiff was allowed leave to amend her complaint to add the adultery claim, *that claim was withdrawn on the second day of trial.* (Exhibit 1, October 30,

2018 Transcript at 6).

66. Defendant, therefore, requests that this Court revisit the award of attorneys' fees and costs and either vacate it all together or substantially reduce the amount Defendant is required to pay.

67. Additionally, if the Court vacates the alimony award, the monetary award or the child support award, the Court is similarly required to vacate the attorneys' fees award as the components of the same are intertwined and the Court is required to consider them in conjunction with one another. *St. Cyr v. St. Cyr*, 228 Md. App. 163, 198 (2016) ("a court's determinations as to alimony, child support, monetary awards, and counsel fees involve overlapping evaluations of the parties' financial circumstances. The factors underlying such awards 'are so interrelated that, when a trial court considers a claim for any one of them, it must weigh the award of any other.' *Turner [v. Turner]*, 147 Md. App. [350,] 400 [(2002)]. 'Therefore, when this Court vacates one such award, we often vacate the remaining awards for reevaluation.' Id. at 401, 809 A.2d 18 (collecting cases); *see also Hiltz [v. Hiltz]*, 213 Md. App. [317,] 322 n. 3 [(2013)] (citing *Doser [v. Doser]*, 106 Md. App. [329,] 335[(1995)]; *Murray v. Murray*, 190 Md. App. 553, 572, 989 A.2d 771 (2010))".

**WHEREFORE**, the Defendant respectfully requests that this Honorable Court:

A.      **GRANT** Defendant's Motion to Alter or Amend;

B.      **ALTER OR AMEND** this Court's March 26, 2019 Order to vacate the Judgement of Absolute Divorce, including the grant of an absolute divorce to Plaintiff;

C.      **ALTER OR AMEND** this Court's March 26, 2019 Order to vacate the monetary award;

D.      **ALTER OR AMEND** this Court's March 26, 2019 Order regarding indefinite alimony;

E.    **ALTER OR AMEND** this Court's March 26, 2019 Order to reduce the child support award from $4,556 to $2,665;

F.    **ALTER OR AMEND** this Court's March 26, 2019 Order to reflect that the payment of the children's unreimbursed medical and dental expenses shall be paid in proportion to the parties' incomes;

G.    **ALTER OR AMEND** this Court's March 26, 2019 Order to vacate the award of use and possession of the family home and family use personal property;

H.    **ALTER OR AMEND** this Court's March 26, 2019 Order to vacate the provision requiring Defendant to pay Plaintiff for her interests in Retina One, LLC and Cynasa Holdings, LLC;

I.    **ALTER OR AMEND** this Court's March 26, 2019 Order to vacate the attorneys' fees and costs award; and

D.    **GRANT** Defendant such further and other relief as the Court deems appropriate.

Respectfully submitted,

The Law Office of Susan J. Rubin

Susan J. Rubin, Esq.
50 West Montgomery Avenue, Suite 105
Rockville, MD 20850
301-251-0095

Certificate of Service

20

I so hereby certify that two copies of this Opposition was sent by first class postage prepaid mail to counsel for Appellee, Christopher J. Gowen, Esq., Gowen, Silva & Winograd, PLLC, 513 Capitol Court, N.E., Suite 100, Washington, D.C. 20002 on the 5th day of April, 2019.

Susan J. Rubin

## REQUEST FOR HEARING

Defendant hereby requests a full hearing on the merits of his Motion to Alter or Amend.

SUSAN J. RUBIN

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

CYNTHIA MELKI      :

   Plaintiff       :

            :

v.            :   Case No. 138142 FL

            :

TOUFIC MELKI      :

   Defendant      :

### ORDER

Upon consideration of Defendant's Motion to Alter or Amend, and any opposition thereto, a hearing having been held and good cause having been shown, it is this _____ day of

_____, 2019 by the Circuit Court for Montgomery County, Maryland

**ORDERED**, that Defendant's Motion to Alter or Amend be, and the same is hereby, **GRANTED**; and it is further

**ORDERED**, that this Court's March 26, 2019 Order be, and hereby is, **AMENDED** to vacate the Judgement of Absolute Divorce, including the grant of an absolute divorce to Plaintiff; and it is further

**ORDERED**, that this Court's March 26, 2019 Order be, and hereby is, **AMENDED** to vacate the monetary award; and it is further

**ORDERED**, that this Court's March 26, 2019 Order be, and hereby is, **AMENDED** regarding indefinite alimony; and it is further

**ORDERED**, that this Court's March 26, 2019 Order be, and hereby is, **AMENDED** to reduce the child support award from $4,556 to $2,665; and it is further

**ORDERED**, that this Court's March 26, 2019 Order be, and hereby is, **AMENDED** to reflect that the payment of the children's unreimbursed medical and dental expenses shall be paid in proportion to the parties' incomes; and it is further

**ORDERED**, that this Court's March 26, 2019 Order be, and hereby is, **AMENDED** to vacate the award of use and possession of the family home and family use personal property; and it is further

**ORDERED**, that this Court's March 26, 2019 Order be, and hereby is, **AMENDED** to vacate the provision requiring Defendant to pay Plaintiff for her interests in Retina One, LLC and Cynasa Holdings, LLC; and it is further

**ORDERED**, that this Court's March 26, 2019 Order be, and hereby is, **AMENDED** to vacate the attorneys' fees and costs award.



_____
Cynthia Callahan, Judge, Circuit Court for
Montgomery County, Maryland

# Exhibit 1

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

```
--------------------------------X
                                :
CYNTHIA MELKI,                  :
                                :
          Plaintiff,            :
                                :
               v.               :         Family Law No. 138142
                                :
TOUFIC MELKI,                   :
                                :
          Defendant.            :
                                :
--------------------------------X
```

MERITS HEARING

Rockville, Maryland                          October 30, 2018

DEPOSITION SERVICES, INC.
12321 Middlebrook Road, Suite 210
Germantown, Maryland 20874
(301) 881-3344

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

```
-------------------------------X
                               :
CYNTHIA MELKI,                 :
                               :
         Plaintiff,            :
                               :
              v.               :        Family Law No. 138142
                               :
TOUFIC MELKI,                  :
                               :
         Defendant.            :
                               :
-------------------------------X
```

Rockville, Maryland

October 30, 2018

WHEREUPON, the proceedings in the above-entitled matter commenced

BEFORE:   THE HONORABLE CYNTHIA CALLAHAN, JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

CHRISTOPHER GOWEN, Esq.
Gowen, Silva & Winograd, PLLC
513 Capitol Court, N.E., Suite 100
Washington, D.C. 20002


FOR THE DEFENDANT:

SUSAN J. RUBIN, Esq.
Law Office of Susan J. Rubin, LLC
50 West Montgomery Avenue, Suite 105
Rockville, Maryland 20850

6

1   that part, but thank you for asking.  Okay.

2           So, then Dr. Melki back on the stand?

3           MR. GOWEN:  Yes.  Sorry, Your Honor, we will also

4   withdraw our claim for adultery at this point on the grounds of

5   divorce.  And then, yes, Dr. Melki come back on the stand.

6           THE COURT:  Okay.

7           (Discussion off the record.)

8           MS. RUBIN:  Your Honor, on behalf --

9           THE COURT:  Sorry.  I'm busy typing away.

10          MS. RUBIN:  On behalf of Dr. Melki, is it okay if he

11  takes his water up with him?

12          THE COURT:  Yeah, that's fine.

13          MS. RUBIN:  Okay.  Well, I just wanted to make sure.

14  And I would like to say one other thing.  (Unintelligible)

15  wants to keep discovery so he can talk and one of the things,

16  Dr. Melki obviously, I will rehabilitate him for want better of

17  a word, on the things he's specifically been asked and then Mr.

18  Gowen is going to call his client and then I will call my

19  client in my case today.  We have agreed to do this out of

20  order, so --

21          THE COURT:  All right.

22          MS. RUBIN:  We just want to keep it going --

23          THE COURT:  It's fine.

24          MS. RUBIN:  -- making sure we have no time that's not

25  used.

1           MR. GOWEN:  Okay.

2           THE COURT:  The question is where does it stand in

3    the context of a resolution --

4           THE WITNESS:  Okay.

5           THE COURT:  -- as far as you know?

6           THE WITNESS:  So, then it was (unintelligible) they

7    concluded it and the property went to my mother.  She won the

8    court case and it's her name.  She is refusing to give me my

9    share of that property, either, either in my name or, and the

10   property should be mine really because I had, actually we were

11   planning to live in it in the future when we moved back to

12   Lebanon and that's part of the, Cynthia knows about it.  It was

13   nothing behind the scenes and they're refusing.  So, I'm suing

14   my mother for my 1.6 million, plus 500,000 in interest, totally

15   unfair, totally stressful and it was very devastating to me.

16   That's why you see many refinances.  That's why it's linked to

17   it.

18          So, I want from my mother, I'm suing her for 2.1

19   million because the interest rates in Lebanon are very high.

20   It's 11 percent.  And it was very, very, very stressful seven

21   years and now they're not, they're not giving me any ownership.

22   They said forget it.

23          MR. GOWEN:  And, so --

24          THE WITNESS:  This is a gift to your mother.  I said,

25   no, it's not a gift.

80

1  past five or six years?

2      A    Well, I stopped now, in the last two or three years

3  we stopped.  There's no more money.  But the answer is, yes,

4  there is not what you stated, several hundred like you, you

5  imply a lot.  It's between 220 to 240 or 50.  I don't have the

6  exact figure.

7      Q    And that money was to Combat Blindness and then

8  Combat Blindness was, you used that money, and then Combat

9  Blindness used that money for the, the Melki clinic in, there

10  is a Melki Clinic in Lebanon, correct?

11     A    No, no, no.  You're confusing.  My father owns a

12  hospital.  My father is a physician.  It's called Melki

13  Hospital.  I have an office there.  When I became an

14  ophthalmologist whenever, 20 years --

15         THE COURT:  Okay, sir, I'm going to stop you again.

16  The narrative doesn't help.  The lawyer is asking you specific

17  questions and you are telling the whole story.  Please don't do

18  that.  Just answer the question.  Your lawyer will clear up

19  whatever it is that didn't get said.

20         THE WITNESS:  Oh, I see.  Okay.  Thank you.  I'm

21  sorry.  So, the money --

22         THE COURT:  No, stop, sir.

23         MR. GOWEN:  Hold it.

24         BY MR. GOWEN:

25     Q    So, the, the, all the money that went to Combat

1  Blindness, the money that you gave to Combat Blindness --

2      A    Correct.

3      Q    -- that money was earmarked for a project in Lebanon?

4      A    Correct.

5      Q    Okay.  And that project was run by you?

6      A    To be run by me and other doctors.  We were going to

7  open a clinic for, to do free surgery because it's a big --

8          THE COURT:  Okay, sir, you've answered the question.

9  I'm sorry.  I'm going to have to do this all the way --

10         MR. GOWEN:  Okay.

11         THE COURT:  -- along because I, we got to keep moving

12  here.

13         BY MR. GOWEN:

14     Q    And so, the money that you gave to Combat Blindness

15  during the marriage, would you say is between two and $300,000,

16  was earmarked for a project in Lebanon that you were running.

17  Now --

18     A    Wait.

19     Q    -- what are you saying happened to that money?  Where

20  did that money go?

21     A    It's very simple.  We showed you everything, they

22  showed you everything.  They bought equipment.  They by law

23  have to buy the equipment.  But due to the circumstances --

24         THE COURT:  Who is the they, sir?

25         THE WITNESS:  I'm sorry?

157

1    MS. RUBIN:  Okay.

2    THE COURT:  So, can I deputize you to -- you can have

3 this part.

4    (Discussion off the record.)

5    THE COURT:  I think they're actually mostly

6 (unintelligible), not very nicely arranged.

7    (Discussion off the record.)

8    MS. RUBIN:  While you're doing that, let me just Mrs.

9 Melki, perhaps, some questions that (unintelligible).

10       CROSS-EXAMINATION

11   BY MS. RUBIN:

12  Q So, Mrs. Melki, when you married, were you living in

13 Lebanon?

14  A Before, yes.

15  Q Okay.  Had you ever lived in the United States when

16 you married?

17  A Before, no.

18  Q Okay.  And you were married in 2009, is that correct?

19  A Correct.

20  Q And what was the date?

21  A June 21, 2009.

22    THE COURT:  So, I'm, I'm going to stop you for a

23 second.  It's just a transaction with the phone between your

24 client and the woman sitting in the back of the room?  I'm a

25 little worried about what's happening here.  I don't know how

1          BY MS. RUBIN:

2      Q    Now, Ms. Melki, you were talking about the date of

3  your marriage.  When was it?

4      A    June 21, 2009.

5      Q    Okay.  And were you married, in what fashion were you

6  married in Lebanon?

7      A    In the church, it's a religious ceremony.

8      Q    And what church was that?

9      A    Sorry?

10     Q    What church was this?

11     A    St. George Tripoli.

12     Q    And what religious (unintelligible), or identity does

13  that church have?

14     A    It's Orthodox, Greek Orthodox.

15     Q    Okay.  And when you got married, you were, did you in

16  particular wish to be married in a religious ceremony?

17     A    That's the only way in Lebanon.

18     Q    So, in Lebanon there are no civil ceremonies, is that

19  correct?

20     A    Correct.

21     Q    And Dr. Melki at the time, though, offered you the

22  other opportunity, which was getting married in the United

23  States, correct?

24     A    No, not correct.

25     Q    Didn't offer you to get married in the United States?

1    A   No.

2    Q   Did he offer as well that you didn't have to get

3  married, you could just live together as one of the options?

4    A   No.

5    Q   And you understood that when you got married

6  according to the church in, the Greek Orthodox church in

7  Lebanon, that you can't get divorced unless you have a cause or

8  grounds to do so, correct?

9    A   Actually, I'm, I'm not --

10    Q   You don't know?

11    A   I don't know, yes.

12    Q   Okay.  Now when you came to the United States, wasn't

13  it always your intention with Dr. Melki to go back and live in

14  Lebanon?

15    A   Yeah, we discussed that, yeah.

16    Q   And you did know at the time that, I take it that Dr.

17  Melki came from a far more wealthy family than yours, correct?

18    A   Yeah.

19    Q   I'm sorry.

20    A   I can tell about my family.  We're very modest family

21  and yeah.

22    Q   Are you suggesting you didn't know that he came from

23  a far wealthier family than yours?

24    A   I can't tell about that.

25    Q   Okay.  Well, you do acknowledge, do you not, that

# Exhibit 2

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

CYNTHIA MELKI

    Plaintiff

    v.                        Case No. 138142 FL

TOUFIC MELKI

    Defendant

## AFFIDAVIT OF TOUFIC MELKI

1.    I am over the age of eighteen, have personal knowledge of the facts herein and am competent to testify.

2.    I am a Greek Orthodox Christian.

3.    Cynthia Melki is a Greek Catholic Christian.

4.    It is my understanding that divorce based on no-fault is a mortal sin according to the Orthodox Christian Church and the Greek Catholic Christian Church.

5.    There are no civil marriages in Lebanon.

6.    Ms. Melki and I have never been married in a civil ceremony.

*I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of the foregoing paper are true.*

_____           4/4/19
Toufic Melki, MD                   Date

# Exhibit 3

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND
**Family Division**

CYNTHIA MELKI                                  :
                                               :
        Plaintiff,                             :
                                               :
v.                                             :              Case No. 138142 FL
                                               :
TOUFIC MELKI                         :         :
                                               :
        Defendant.                             :

---

**EXPERT REPORT
OF ABED AWAD**

---

My name is Abed Awad. My curriculum vitae, including my qualifications to render an expert opinion in this matter, is attached hereto as **Exhibit A.**

Counsel for Toufic Melki (hereinafter "Husband") have asked me to provide opinions in light of my academic and legal experience in connection with Lebanese family law (Orthodox Christian canon law), rules of procedure, international family law, and Lebanese culture. More specifically, they have asked me to answer the following questions:

(i)     Does Lebanese law permit civil marriage in Lebanon?

(ii)    What Court has subject matter jurisdiction to dissolve a Christian Orthodox marriage contracted in Lebanon between Lebanese citizens and what substantive law does such court apply?

(iii)   Does Lebanese law permit a mutual no-fault divorce?

(iv)    Would a Lebanese civil court and/or religious court recognize a Maryland divorce?

It is my expert opinion that according to Lebanese law:

(i)     There is no civil marriage in Lebanon. The only marriages in Lebanon that are valid are religious marriages that are governed by religious law - Islamic law and canon law.

(ii)    The Orthodox Antioch Ecclesiastical court (hereinafter the "Ecclesiastical Church" or the "Orthodox Ecclesiastical Church") has exclusive jurisdiction to dissolve Christian marriages between Lebanese citizens and the court would apply Greek Orthodox Antioch canon family law on the dispute.

(iii)   Lebanese law does not permit a no-fault divorce, even if mutually agreed between the parties.

(iv)    Neither the Lebanese civil courts nor the Ecclesiastical court would recognize a Maryland divorce because jurisdiction to dissolve a Christian marriage is exclusively with the Lebanese Orthodox Ecclesiastical court.

The details and supporting authorities for my conclusions are set forth below.

## STATEMENT OF RELEVANT FACTS

Toufic Melki ["Husband"] and Cynthia Melki ["Wife"] are both Americans with Lebanese citizenship. They were married on June 21, 2009 in Lebanon in the Greek Orthodox Church.

## DOCUMENTS REVIEWED AND RELIED UPON

I have reviewed and relied upon Lebanese statutes, treatises, scholarly opinions, and other commentaries. I also reviewed the following documents:

- Certification of Toufic Melki dated August 29, 2018 (**Exhibit B**);

- Letter from Lebanese Priest dated April 3, 2019 (**Exhibit C**);

- Case No. 114, Jabal Lebanon Appellate Court (11/29/1988) (**Exhibit D**); and

- <u>Church Divorce Does not Dissolve a Civil Marriage</u>, Al Akhbar, July 18, 2008 (**Exhibit E**).

## EXPERT OPINION

**(i)  There is no civil marriage in Lebanon. The only marriages in Lebanon that are valid are religious marriages governed by religious law – Islamic law and canon law.**

With no civil law marriage in Lebanon, marriages in Lebanon are strictly religious. For a marriage to be valid in Lebanon, it must be solemnized religiously. A brief explanation of the religious court system at this juncture is appropriate. The Lebanese Judicial System is composed of courts of general jurisdiction (first instance, appeal, and cassation), administrative courts, and confessional/religious courts (first instance and appeal).

For the purposes of my expert opinion, we are only concerned with the Christian Ecclesiastical religious courts. Yousef Nhra and Khalil Antoun Sfir, Ahkam Al-Ahwal Al-Shaksiah Leda Jami Al-Tawa'f [Personal Status Laws Governing All Communities] (2002), 44-45. The jurisdiction of the Ecclesiastical court includes all "personal status" matters, such as divorce, marriage, and custody.

Lebanese law recognizes seventeen religious communities. *Id* at 26-27. While Lebanon has uniform substantive codes regarding commercial law and criminal law, "personal status," that is, all matters related to the family, such as, marriage, divorce, custody, inheritance, and guardianship, continue to be governed by religious law. Each one of these seventeen religious communities has its own body of law governing "personal status" matters. *Id* at 42.

In other words, the Catholic community in Lebanon has its own religious judicial system to adjudicate matters relating to marriage, divorce, and custody between Catholic citizens. Their

religious law is different than the Greek Orthodox law, for example. It is different than Islamic Sunni law on the same matters.

**(ii)   The Orthodox Antioch Ecclesiastical Court has exclusive jurisdiction to dissolve an Orthodox marriage in Lebanon and canon law is the substantive law that the Lebanese court would apply to a divorce action involving Christian Orthodox Lebanese citizens.**

Here, the parties are Lebanese citizens belonging to the Greek Orthodox Church. They married in Lebanon. Their marriage was a church marriage. Because of the parties' religious affiliation, Lebanese citizenship, and entering into their church marriage in Lebanon, the Orthodox Antioch Ecclesiastical Court and canon law would govern any dissolution of their marriage.

**(iii)  Lebanese law does not permit a no-fault divorce, even if mutually agreed between the parties.**

The Orthodox community does not permit divorce except in very limited circumstances. The consent of the parties to a divorce is not sufficient grounds. Article 69, Greek Orthodox Antioch Personal Status Code.

The dissolution of the marital bond by annulment, cancelation, or divorce occurs only by a judgment from the competent Ecclesiastical court with jurisdiction. Article 66, Greek Orthodox Antioch Personal Status Code.

Article 67 of the Greek Orthodox Antioch Personal Status Code provides the following grounds permit a spouse to seek a divorce:

1. If one of the spouses converted into another religion;
2. If one person tries to kill the other;
3. If one of them was sentenced to three years maximum of imprisonment for flagrant crime;

4. If one of the spouses has neglected the other one for more than three years, whether he/she was away from his/her residence or living in it and the tribunal has not succeeded to convince him/her to return to the matrimonial life, provided that the three years time limit shall start to run once one of the spouses inform officially the Parish Priest or the Religious Chief of the arising conflict.

5. If the Tribunal officially sentenced the separation for three years maximum and the efforts deployed for conciliation and the returning of common life have not succeeded, provided that the prejudiced party files a new lawsuit.

6. If one of the spouses has intentionally refused, without the consent of the other, to procreate by any means of has abstained from sexual intercourse without justification or legitimate causes to be estimated by the tribunal.

Article 68 of the Greek Orthodox Antioch Personal Status Code permits the parties to seek a divorce based on adultery ("Any of the prejudiced spouses is entitled to file for divorce for adultery or what is considered as similar to adultery provided submitting an evidence thereto, stipulating that the Tribunal decides upon what is similar to adultery.").

Article 69 of the Greek Orthodox Antioch Personal Status Code defines what is "considered as similar to adultery" for a husband to seek a divorce:

Are considered as similar to adultery the cases mentioned below without limitation, and the husband is therefore entitled to ask for the divorce from the wife:

1. If he finds out that the wife is not a virgin, unless he knows about her before the marriage. Therefore, he shall submit the case immediately to the local religious chief with proofs.

2. If the husband has repeatedly asked his wife not to patronize a place or people with bad reputation and she didn't comply.

3. If the wife, without obtaining the approval of her husband, has slept in a suspicious place, except when her husband has expulsed his wife outside the home, by force or as a result of violence he committed against her. In this case, she is entitled to resort to the house of her parents or one of her female cousins. In case she has no one to recourse to, she shall go to a safe non suspicious place.

4. If the tribunal has condemned her to follow her husband to his place of residence and she refused that, or in case the tribunal has condemned her to return to the matrimonial house and has specified a time limit for her to return and she didn't comply without submitting an acceptable excuse.

5.    If the sexual perversion of the wife is proven.

Article 70 of the Greek Orthodox Antioch Personal Status Code defines what is "considered as similar to adultery" for a wife to seek a divorce:

> Are considered as similar to adultery the cases mentioned below without limitation, and the wife is therefore entitled to ask for the divorce from the husband:
>
> 1.    If the husband prejudices his wife's chastity, by facilitating act of adultery and insisted on her against her will, or he has committed anal sex to her.
> 2.    If he has claimed that she committed adultery without submitting proof.
> 3.    If the sexual perversion of the husband is proven.
> 4.    If the wife has repeatedly asked her husband not to patronize a place or people with bad reputation and he didn't comply.

The above are the only grounds for divorce. Until a party pleads and proves a ground for divorce, the Ecclesiastical court will not dissolve the bond of marriage.

Divorce is extremely sensitive to the Orthodox community in Lebanon. The biblical basis for the Church's view of marriage and divorce is found in Matthew: "For this reason a man will leave his father and mother and be united to his wife, and the two will become one flesh?" So they are no longer two but one. Therefore what God has joined together, let man not separate" (Matthew 19:4-6).

As a conservative devout Christian community with deep church history (widely considered one of the earliest churches in Christianity), the biblical view of marriage as a sacrament and a divine union that can't be broken is taken seriously.

It is obvious that Husband has a genuinely held religious belief that his marriage is a religious sacrament that cannot be dissolved except for the limited grounds permitted in his religious faith. This genuinely held religious belief is widely held in his community in all of Lebanon.

**(iv)  Lebanese courts will not recognize a Maryland divorce inasmuch as jurisdiction to dissolve a Christian marriage is exclusively with the Lebanese Ecclesiastical Orthodox court.**

It is well settled law in Lebanon that Lebanese civil courts and the Ecclesiastical court will not recognize a civil/secular divorce of a couple that had a religious Christian marriage in Lebanon. This is not surprising. With no civil marriage possible in Lebanon, every marriage is a religious marriage. Under Lebanese law, the religious courts have exclusive subject matter jurisdiction to dissolve marriages. Therefore, only an ecclesiastical court has authority and jurisdiction to dissolve a Christian marriage. A foreign civil divorce could not dissolve a religious Christian marriage. *See, e.g.,* Case No. 114, Jabal Lebanon Appellate Court (11/29/1988) (holding that a civil court does not have jurisdiction to dissolve a foreign civil marriage that was followed by a Christian marriage in Lebanon because exclusive jurisdiction to dissolve the marriage is squarely with the ecclesiastical court) **(Exhibit D)**. Logically, therefore, if a couple had both a civil and religious marriage, they must obtain a secular dissolution of their civil marriage and obtain an ecclesiastical divorce of their religious marriage. *See, e.g.,* Church Divorce Does not Dissolve a Civil Marriage, Al Akhbar, July 18, 2008 (reporting a story about a Lebanese couple with a civil and religious marriage that had to obtain two separate and independent divorces: an ecclesiastical divorce for the religious marriage and a civil divorce for the civil marriage). https://al-akhbar.com/Archive_Justice/162009 (last visited April 4, 2019) **(Exhibit E)**.

Here, there is only a religious marriage; therefore, only the Ecclesiastical court has authority to dissolve the religious marriage and only after a spouse proves a valid ground for divorce under the Greek Orthodox Antioch Personal Status Code.

## CONCLUSION

To summarize, there is no civil marriage in Lebanon and only religious marriages in Lebanon are valid. In Lebanon, marriage and divorce are governed by Canon law and the Ecclesiastical court has exclusive subject matter jurisdiction in divorce matters. Lebanese law does not permit a no-fault divorce, even if mutual. Finally, Lebanese courts will not recognize a Maryland divorce because jurisdiction to dissolve a Christian marriage is exclusively with the Lebanese Orthodox Ecclesiastical Court.

Dated: April 4, 2019

ABED AWAD, ESQ.

EXHIBIT "A"

# ABED AWAD

777 Terrace Avenue, Suite 303
Hasbrouck Heights, NJ 07604
201.462.9500 | awad@awadkhoury.com
linkedin.com/in/abed-awad

## LEGAL EXPERIENCE

**AWAD & KHOURY, ATTORNEYS AT LAW, HASBROUCK HEIGHTS, NJ**                          2010 – PRESENT
**PARTNER**

- Practice areas include: complex civil and family litigation cases with international or multijurisdictional components; commercial litigation including the enforcement of foreign judgments; litigation of shareholder disputes; provide legal and business advice to foreign and domestic individual investors on legal affairs in the United States.
- Admitted in New Jersey State Courts, New Jersey Federal District Court and Third Circuit.
- Admitted in New York State Courts and New York Federal Court (Southern and Eastern Districts).
- Regularly provides services as an expert witness in Islamic Law and culture, Middle Eastern law; testified, consulted and provided expert reports for courts and attorneys throughout the United States and England concerning the interpretation and application of the following laws: Shari'a (Islamic law), Egyptian, Syrian, Qatar, Kuwaiti, United Arab Emirates, Palestinian, Jordanian, Lebanese, Djibouti, Saudi Arabian, Omani, Moroccan, Iraqi, Iranian, Libyan, Singaporean, Pakistani, Mali, Indonesian, Gambian, Bangladesh, Ja'fari (Shia), Jewish law (Morocco and Egypt), and Canon law (Coptic Orthodox, Catholic, Greek Orthodox, and Protestant).
- "AV" rated by Martindale-Hubbel
- Fellow of the International Academy of Family Lawyers

**LAW OFFICES OF ABED AWAD, CLIFTON, NJ**                                           1999 - 2010

## ACADEMIC EXPERIENCE

**RUTGERS UNIVERSITY SCHOOL OF LAW, NEWARK, NJ**                                    JAN 2003 - PRESENT
**ADJUNCT PROFESSOR**
- Courses Taught: Islamic Jurisprudence; Matrimonial Litigation; Islamic Finance

**PACE UNIVERSITY SCHOOL OF LAW, WHITE PLAINS, NY**                                 JAN 2009 - 2012
**ADJUNCT PROFESSOR**
- Courses Taught: Islamic Jurisprudence

**SETON HALL LAW STUDY ABROAD PROGRAM, AMMAN, JORDAN**                              JULY 2011 - AUGUST 2011
**ADJUNCT PROFESSOR**
- Courses Taught: Islamic Banking and Finance

## ACADEMIC PUBLICATION BOARD

**SHARIAsource, ISLAMIC LAW PROGRAM, HARVARD LAW SCHOOL**                           JUNE 2015 - PRESENT
**U.S. EDITOR & CONTRIBUTOR**

Abed Awad

## JUDICIAL CLERKSHIPS AND JUDICIAL INTERNSHIPS

**HONORABLE GEORGE E. SABBATH, NEW JERSEY SUPERIOR COURT (FAMILY PART)**   1998 – 1999
**LAW CLERK**
- Drafted opinions; wrote legal memoranda; prepared cases for motions, trials, and hearings.

**HONORABLE FRANCIS A. NICOLAI, NEW YORK SUPREME COURT 9TH DISTRICT**   1998
**JUDICIAL INTERN**
- Conducted legal research regarding cases pending before the court; attended trials and hearings.

**INTER-UNIVERSITY ASSOCIATES, INC.,** HASTINGS ON HUDSON, NY   1996 – 1997
**RESEARCH ASSOCIATE**
- Translated and reviewed Arabic legal texts for 18 volume treatise: Constitutions of the Countries of the World.
- Conducted legal research in Arabic relating to Arab countries' press and constitutional laws.

## AWARDS

| | |
|---|---|
| Unchained at Last's Pro Bono Attorney of the Year | 2018 |
| New Jersey Muslim Lawyers Associations' Scholar of the Year | 2018 |
| Global Law Expert's Islamic Law Firm of the Year in the US | 2017 |
| Corporate INTL's Islamic Law Firm of the Year in New Jersey, US | 2017 |
| Avenue Magazine's Legal Elite | 2010 |
| Vision and Achievement Award, Mental Health Association in Passaic County | 2009 |
| Community Activism Award, Arab-American Anti-Discrimination Committee | 2007 |
| National Lawyer's Weekly Magazine's Lawyer of the Year | 2002 |

## PROFESSIONAL MEMBERSHIPS & AFFILIATIONS

American-Arab Anti-Discrimination Committee (ADC), National Board of Directors, 2016 - Present
Muslim Women Lawyers for Human Rights (Karamah), Member, Board of Directors, 2003 – 2013, 2015 – Present
New Jersey State Bar Association
New York State Bar Association
American Bar Association - Middle East Law Committee
International Law Association
New Jersey Muslim Lawyers Association
New York Muslim Lawyers Association
National Association of Muslim Lawyers
Hague Expert's Group on Family Agreements
NJ Supreme Court District XI Ethics Committee of Passaic County, Member, 2009 – 2013
Alphabet Kids, Inc., Member, Advisory Board, 2009 – 2013
Passaic County Improvement Authority, Member, Board of Directors, 2007 – 2010
Rutgers University Contemporary Arab Studies Program, Member, Steering Committee, 2005
New Jersey Electoral College, Member, 2004
NJ State Democratic Committee-Affirmative Action Delegate Selection Committee, Member, 2004

Abed Awad

## LANGUAGES

Modern Standard Arabic (native fluency in reading, writing, speaking)
Colloquial Arabic (fluent in various dialects)
English (native fluency in reading, writing, speaking)

## EDUCATION

**Juris Doctorate (JD)**
PACE UNIVERSITY SCHOOL OF LAW, White Plains, NY,                                          1998
  • New York State Bar Association Law Student Ethics Essay Award, 1997
  • Pace International Law Review, a Managing Editor, 1997-1998

Master of Arts (MA), Near and Middle East Studies                                        1995
Certificate, Comparative Law                                                              1994
SCHOOL OF ORIENTAL AND AFRICAN STUDIES (SOAS), UNIVERSITY OF LONDON, London, England

Graduate-Level Coursework in: Islamic Revivalist Movement, Islamic Legal Texts,
Arabic Composition and Modern Arabic Poetry
COLUMBIA UNIVERSITY, New York, NY                                                    1992 – 1993

Bachelor of Arts (BA), Political Science
SAINT PETER'S COLLEGE, Jersey City, NJ                                                    1991

## CERTIFICATION

Certificate, National Institute of Trial Advocacy                                        2000
Certificate, Film Commission Fundamentals                                                2000
Certified Mediator, New Jersey Superior Court                                            1999
Certificate International Law, Pace University School of Law                             1998

## MEDIA COMMENTATOR - POLITICAL & LEGAL (MORE THAN 200 TV & RADIO APPEARANCES)

– Political & Legal Commentator , December 2004 – Present, regularly
  o  Appear on television and radio networks; over 200 appearances as a political and legal commentator on:
     Al-Jazeera, PBS, ABC, CNN, Huffington Post Live, Canadian Broadcasting Corporation, CNNfn, BBC World
     Service Radio, BBC World Service Arabic Television, ART, NPR, LBC, Al-Rafidain TV, Al-Qataria, Al-Saah TV,
     Fox, Al-Arabia, Channel 4 (England), Shams Radio, Vatican-Arabic Radio, Monte Carlo Radio, and The Voice
     of Arabs Radio (Cairo)
  o  Quoted in numerous media outlets including, but not limited to, The New York Times, Washington Post,
     Boston Globe, Philadelphia Inquirer, Chicago Tribune, Newsweek, CNN.com, Fox.com, Salon.com, Fort
     Worth Star-Telegram, American Prospect, Star Ledger, Herald News, Bergen Record, Village Voice, New
     Jersey Law Journal, Chicago Lawyer, ABA Law Student Magazine, Hollywood Reports, Variety, and Screen
     International

## SELECTED PUBLICATIONS & PRESENTATIONS

- "Opinion: History, fasting and the festive spirit of Ramadan," *The Record*, June 12, 2018
- Harvard Law School's Islamic Law Program's ShariaSource Blog (Peer Reviewed):
  - "Islamic Center of Nashville: Ijara Financing Cancels Religious Tax Exemption for Financed Property," December 12, 2017
  - "Islamic Law in U.S. Courts: Anti-Shari'a Ban in Kansas," July 14, 2017
  - "NY Court Ruling Against a Muslim Man's Attempt to Unilaterally Divorce His Wife," March 6, 2017
  - "Does a Muslim Inmate Have a First Amendment Right to a Halal Meal?" September 8, 2016
  - "No, Newt: Anti-Shari'a Rhetoric Doesn't Change the Law," July 18, 2016
- "I'm a NJ Muslim: How I Celebrate Jesus' Birth with My Family," Star Ledger, December 24, 2016
- "16 is a Little Young to Get Married, Isn't It?" Star Ledger; November 13, 2016
- "Five Things You Didn't Know About Religious Veils," CNN.com, June 9, 2015
- "What ISIS – and the West – Get Wrong about Jihad," CNN.com, May 29, 2015
- "Al-Rida wa Hukum al-'Idam *(Apostasy and the Death Penalty)*" (Arabic), Al-Hawadeth Newspaper, December, 2014
- "Does Islam Really Condemn Converts To Death?" CNN.com, June 6, 2014
- "Islamic Family Law in American Court: A Rich, Diverse and Evolving Jurisprudence, in Islamic Family Law in the West," Routledge, 2014
- "Marriage: Legal Foundations," Oxford Encyclopedia of Women and Islam, 2013
- "Divorce: Legal Foundations", (co-authored), Oxford Encyclopedia of Women and Islam, 2013
- "Who is Next? Egyptian, Beware of the Military," (Arabic), Al-Quds Al-Arabi, July 16, 2013
- "The True Story of Sharia in American Courts," The Nation Magazine, June 13, 2012
- "Chipping Away At Divorce Quagmire for Muslim and Jewish Women," New Jersey Law Journal (Feb 13, 2012)
- "Negative Connotations Surrounding Sharia Must be Dispelled," Jurist-Sidebar, February 2, 2012
- "Appeals Court Had the Chance to Do Right By a Wife and Children – But Declined It," North Carolina Lawyers Weekly, December 26, 2011
- "Q & A: What Sharia Law Actually Means," Salon.com, February 28, 2011
- "Iflas& Chapter 11: Classical Islamic Law and Modern Bankruptcy Law," 44 Int'l Law. 975 (2010) (co-authored)
- "Oklahoma Amendment is Unconstitutional: Barring Court from Considering Sharia Law Violated the Supremacy Clause & the First Amendment'" National Law Journal, November 15, 2010
- "Religion-Based Claim in Abuse Case Wisely Pierced by Appeals Court," New Jersey Law Journal, September 17, 2010)
- "Umar's Magic Oven" (children's book); co-author, 2010
- "Court Enforces Mahr Provision in Muslim Marriage Contract,) New Jersey Law Journal, September 9, 2002
- "Beware of International Service of Process," New Jersey Law Journal, March 13, 2002
- "When Custody Disputes Go Global," New Jersey Law Journal, August 7, 2000
- "Attorney Client Sex Should Always be Off Limits," New Jersey Law Journal, March 13, 2000
- "Attorney-Client Sexual Relations," 22J. Legal Prof. 131, 1998
- "The Concept of Defect in American & English Products Liability Discourse: Despite Strict Liability Linguistics, Negligence is back with a Vengeance!" 10(1) Pace International Law Review, 1998
- "U.S. Claims against Iraq Outside UNCC Jurisdiction: Focus on Letters of Credit," 22(2) Middle East Exec. Rep. 9, February 1999
- "Enforcement & Setting Aside of Arbitral Awards in Egypt," (work in progress)
- "Translation and Annotation of Chapter on Bankruptcy in Ibn Qudama's Al-Mughni: Translation with Commentary," (work in progress)
- "Civil Procedure in the Arab Middle East," (work in progress)

## SELECTED LECTURES ON COMMERCIAL LAW

- *Can a New Fraternal Really be Built?*, American Fraternal Alliance, Arlington, VA, April 24, 2018
- *The Intersection of Islamic Finance and Corporate Insolvency*, World Bank, Panelist, Washington, DC, November 20, 2015
- *Introduction to the Moral Foundation of Islamic Finance*, The Institute for Public-Private Partnerships (IP3), Panelist, July 28, 2015
- *Middle Eastern and Islamic Commercial Law,* Eight International Conference on Contracts, Texas Wesleyan School of Law, Panelist, February 22, 2013
- *Shari'a Law and Islamic Finance – A Threat to America?,* New York City Bar Association, Panelist, NY, , November 29, 2011
- *Recognition & Enforcement of Foreign Money Judgment by American Courts and Middle East Courts,* U.S. Department of State Training of Iraqi Judges, Lecturer, Washington, D.C., September 28, 2010
- *Islamic Capital Markets: Past, Present & Future,* New York City Bar Association, CLE Panelist, NY, February 2010
- *Food, Clothing & Shelter – An Economic Human Right: Islamic Law of Bankruptcy,* Journal of Law & Religion Symposium, Panelist, Hamline University Law School, October 16, 2009
- *Islamic Financial Products,* American Bar Association, Panelist, Chicago, IL, August 2009
- *Structuring a Shari'a Compliant Transaction,* New York City Bar Association, CLE Panelist, NY, June 2009
- *Business & Commercial Entities Approved Under Classical Shari'a Doctrine,* New York City Bar Association, CLE Panelist, September 2008; March 2007
- *Fatwas to Solve Commercial Disputes,* New York City Bar Association, CLE Panelist, January 2008
- *Islamic Commercial Law in Comparative Context,* Rutgers Law School-Newark, Lecturer, 2006

## SELECTED LECTURES ON GENERAL SHARI'A

- *Islamic Law in the United States,* Dallas, TX, National Association of Muslim Lawyers, Annual Conference 2018, October 13, 2018
- *Domestic Violence & Sexual Assault, Cultural Insensitivity: Challenges with New Immigrants and Refugees,* Dearborn Police Station Training, ACCESS Community Health and Research Center, Dearborn, MI, June 5, 2018
- *Domestic Violence & Sexual Assault*, Wayne County Circuit Court Judges Training, ACCESS Community Health and Research Center, Dearborn, MI, June 4, 2018
- *Sharia Law in the Courts - Europe and the U.S.*, New York City Bar Association, Panelist, New York, New York, April 17, 2018
- *The Moroccan Legal System,* University of Colorado Law School, Webinar, May 11, 2017
- *Muslim Leadership Training Program,* Cordoba House, New York, NY, October-November 2016
- American-Arab Anti-Discrimination Committee, Washington, DC, September 30, 2016, 2016 Convention
- *ISIS are a Bunch of Criminals Who Do Not Represent Islam and the Quran,* says Rutgers Professor Smerconish, November 18, 2015
- *Islamic Law and U.S. Civil Law: Women's Right from a Comparative Legal Perspective*, Howard Law School, February 28, 2013
- *Why is Islamic Jurisprudence relevant today?* Princeton Adult School, November 13, 2012
- *Religions in the Courtroom*, Illinois Law School, Jewish Law Students Association, Panelist, IL, November 8, 2011
- *The Anti-Shari'a Movement-Unconstitutional Discrimination or Homeland Security?* International Law Weekend, Panelist, ABILA & ILSA, NY, October 21, 2011
- *Women and Islam,* U.S. Military Academy (West Point) Gender Equity Conference, Panelist, NY, April 7, 2011
- *Muslim America, Sharia & the Constitution,* Murray State University, Lecturer, KY, March 25, 2011
- *Constitutionality of the Anti-Sharia Legislation,* New York University, Panelist, NY, April 13, 2011

- *Sharia in American Courts & the Oklahoma Ban on Sharia,* New York City Bar Association, Panelist, NY, December 9, 2010
- *Islamic Law 101,* New York County Lawyer Association, Panelist, NY, May 2010
- *What You Need to Know about Islamic Law,* New York City Bar Association, Panelist, NY, April 2010
- *Religion and Law: Cannon Law, Jewish Law & Islamic Law,* Seton Hall School of Law, Panelist, NJ, March 25, 2010
- *Capital Punishment & Islamic Law,* New York City Bar Association, Panelist, NY, July 2009
- *Honor Killing" & Islamic Law: Two Recent Fatwas,* New York City Bar Association, Panelist, NY, May 2009
- *The Future of Islam in America,* Channel 4 (UK), Expert, June 2008
- *Beyond Belief: Religion in Film,* SilverDocs, Panelist, MD, June 2007
- *The Evolution of Gender Relations in the Cultures of the Near East from Assyria to Islam,* New York University, Guest Lecturer, NY, April 2007
- *Arab & Muslim Cultural Issues In New Jersey Courts,* New Jersey Bar Association Annual Convention, Panelist, NJ, May 2006
- *Introduction to Islam,* Youth for Understanding Host Families and Staff Retreat, Lecturer, April 2006; June 2006
- *Introduction to Islamic Law,* Seton Hall University-Whitehead School of Diplomacy & International Relations, Lecturer, Nov 2006
- *Islamic Law In New Jersey Court,* Union County Women's Bar Association, Lecturer, NJ, 2004

## SELECTED LECTURES ON FAMILY LAW

- *Family Law from A to Z: "Legal Update: A Year in Review,"* Saddlebrook, NJ, National Business Institute (NBI), CLE Lecturer, December 7, 2018
- *The Islamic Marriage Contract in American Courts,* Washington, D.C., Karamah Law & Leadership Summer Program 2018, CLE Lecturer, July 19, 2018
- *The Enforcement of the Marriage Contract in American Courts,* Washington, D.C., Karamah Law & Leadership Summer Program 2018, CLE Lecturer, July 19, 2018
- *Matrimonial Law: Prenups, Mid-Marriage Agreements, MAHRS, & GETS,* Atlantic City, NJ, New Jersey Association for Justice, Boardwalk Seminar, CLE Lecturer, May 10, 2018
- *The Intersection of Shari'a Law and State Divorce Law,* ClearLaw Institute, Webinar, October 27, 2016
- *Islamic Marriage Contracts Workshop,* Karamah, Washington, DC, September 17, 2016
- *Family Law: A Survey of Middle Eastern Family Law in American Courts,* National Council of Juvenile and Family Court Judges, Webinar, September 14, 2016
- *Islamic Marriage Contracts,* Karamah, CLE Panelist, Washington, D.C., July 25, 2016
- *Islamic Family Law In American Courts,* National Council of Juvenile and Family Court Judges, July 19, 2016, 79th Annual Conference. CLE Lecturer, Monterey, CA
- *International Parental Child Abduction,* 2016 Family Division/Domestic Violence Education Conference, April 11, 2016
- *Matrimonial Law,* New Jersey Association for Justice, CLE Lecturer, East Rutherford, NJ, November 19, 2015
- *International Family Law: Islamic Family Law in American Courts,* American Bar Association, CLE Lecturer, November 17, 2015
- *Islamic Family Law in American Courts,* Abed Awad, Esq. (Lecture and Informational Tour of the Bergen County Superior Court to Moroccan Magistrates), October 14, 2015
- *Islamic Marriage Contracts,* Karamah, CLE Panelist, Washington, D.C., August 14, 2014
- *Islamic Family Law in America: A Rich, Diverse and Evolving Jurisprudence,* National Council of Juvenile and Family Court Judge, July 16, 2013, 76th Annual Conference. CLE Lecturer, Seattle, WA
- *Islamic Family Law in American Court: Practitioner's Perspective,* Pennsylvania Bar Association, CLE Lecturer, July 12, 2013

- *Immigration and Cultural Issues in Family Law,* New Jersey Association for Justice (formerly ATLA), CLE Lecturer, April 2012
- *International Family Law: Islamic Law & Culture in American Courts,* The Iowa State Bar Association, CLE Lecturer, IA, October 28, 2011
- *The Impact of Religion & Culture in Divorce,* Middlesex County Bar Association, Lecturer, NJ, October 17, 2011
- Culture, Religion & Divorce in American Courts, American Academy of Matrimonial Lawyers-Ohio Chapter, Lecturer, October 10, 2011
- *Culture, Religion & Divorce in New Jersey,* Middlesex County Bar Association, Panelist, NJ, June 15, 2011
- *International Child Abductions,* Karamah, CLE Panelist, Washington, D.C. , March 31, 2011
- *Muslim Religious Divorces & American Divorce Litigation,* International Academy of Matrimonial Lawyers-Florida Chapter, Panelist, February 19, 2011
- *Muslim Marriage Contracts in American Courts - Recent Cases,* Karamah, CLE Panelist, Washington, D.C. , January 20, 2011
- *Islamic Family Law in American Courts,* American Academy of Matrimonial Lawyers-Illinois Chapter, Lecturer, November 5, 2010
- *Muslim Marriage Contracts in American Courts - Recent Cases,* Advanced Law and Leadership Program, Karamah, Lecturer, Washington, D.C., July 2010
- *Islamic Family Law in American Courts,* Arab Community Center for Economic & Social Services, Lecturer, MI, February 24-25, 2010; led a half-day workshop training for Michigan State Court Judges on Islamic family law in American courts; led a half-day workshop training for Michigan attorneys, court personnel & community service providers
- *Family Law Reform Trends in the Arab World: Egypt, Jordan, Morocco, Kuwait, United Arab Emirates & Saudi Arabia,* Karamah, Guest Lecturer, Washington D.C., November 18, 2009
- *Intersection of Islamic Law and Texas Family Law,* American Civil Liberties Union of Texas Panelist, CLE Panelist, September 25, 2009
- *Muslim Americans and Family Law in U.S. Courts,* National Association of Muslim Lawyers Convention, Panelist, November 2007
- *Caught Between Two Worlds: Islamic & American Family Laws Regarding Marriage, Divorce,* & Child Custody, Islamic Society of North America Convention, Panelist, September 2006
- *American Muslim Divorce Litigation: A Practitioner's Perspective from the Trenches,* Muslim Women Leadership Conference, Karamah, Lecturer, 2004, 2006. 2008, 2009 (Summer)

## LECTURES – OTHER

- *Cultural Competency as a Skill for Attorneys: Strategies and Practical Tips to be an Effective Cross-Cultural Lawyer,* Paramus, NJ, Northeast New Jersey Legal Services, Panel, September 13, 2018
- *Effective Long-Term Strategies to Understand and To Prevent Terrorism,* Saint Joseph's University, Guest Lecturer, Philadelphia, PA, October 31, 2009
- *Election Campaign Financing: An American Perspective with Skills & Strategies to Raise Money for Candidates,* National Democratic Institute (NDI), Two-Day Workshop Trainer, Rabat, Morocco, February 2009
- *Skills & Strategies to Increase Voter Turnout,* NDI, American GOTV, Two-Day Workshop Trainer, Casablanca, Morocco, February 2007
- *Sovereignty & Terrorism,* Rutgers University School of Law, Lecturer, NJ, November 2006
- *Religious Discrimination in the Work Place,* Rutgers University School of Law, Panelist, April 2016

EXHIBIT "B"



IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

CYNTHIA MELKI                          :
      Plaintiff,                    :
                           :
v.                                     :          Case No. 138142-FL
                           :
TOUFIC MELKI                           :
      Defendant.                    :

## AFFIDAVIT OF TOUFIC MELKI IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1.      My name is Toufic Melki. I am over the age of eighteen years, am the Defendant in the above-captioned matter, and am competent to offer testimony in this matter.

2.      On June 21, 2009, I married Cynthia Melki, the Plaintiff in the above-captioned matter, in Tripoli, Lebanon. We were married by Orthodox Christian clergy pursuant to Lebanese law and the rules and customs of the Orthodox Church.

3.      At the time of our marriage, both Cynthia and I had Lebanese citizenship, and maintain our Lebanese citizenship to this day.

4.      At the time of our marriage, Cynthia and I agreed to live in the United States temporarily after our marriage and then return to live in Lebanon.

5.      It was very important to me that Cynthia and I marry in Lebanon under Lebanese law and the rules and cannons of the Orthodox Church so that our marriage would be governed by such law and cannons.

6.      It is my understanding that under Lebanese law and the Cannons of the Orthodox Church, divorce will not be granted or recognized without proof of fault by a party to the marriage.

7.    I have not committed any act which would entitle Plaintiff to a divorce under Lebanese law, and do not consent to the divorce requested by Plaintiff in this matter.

I HEREBY SWEAR AND AFFIRM under penalties of perjury that the foregoing statements are true and accurate to the best of my knowledge, information and belief.

8/29/18
Date

TOUFIC MELKI



DEFENDANT'S EXHIBIT 2

**Page 1**

1  IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND
2  CYNTHIA MELKI,
3      Plaintiff,
4  v.        Case No. 138142-FL
5  TOUFIC MELKI,
6      Defendant.
7          Friday, May 18, 2018
8          North Bethesda, Maryland
9
10         DEPOSITION OF TOUFIC MELKI, M.D.
11
12         The deposition of TOUFIC MELKI, M.D., was
13  taken on Friday, May 18, 2018, commencing at 2:12
14  p.m., at the law offices of O'Reilly & Mark, P.C.,
15  11200 Rockville Pike, Suite 405, North Bethesda,
16  Maryland 20852, before RANDY T. SANDEFER, RPR,
17  Stenotype Reporter and Notary Public in and for the
18  State of Maryland.
19
20
21
22

**Page 2**

1  APPEARANCES:
2
3  On behalf of the Plaintiff:
4      CHRISTOPHER J. GOWEN, ESQ.
5      Gowen Silva & Winograd PLLC
6      513 Capitol Court, N.E.
7      Suite 100
8      Washington, D.C. 20002
9      (202) 408-5400
10     cgowen@gowensilva.com
11
12  On behalf of the Defendant:
13     BART COLOMBO, ESQ.
14     O'Reilly & Mark, P.C.
15     21 Main Street
16     P.O. Box 305
17     Round Hill, Virginia 20142
18     (703) 442-4166
19     bcolombo@oreillymark.com
20
21
22

**Page 3**

1  ALSO PRESENT (Alphabetically):
2      Ms. Cynthia Melki, Plaintiff
3      Mr. Nick Poz, Gowen Silva & Winograd
4      Ms. Judith St. Ledger-Roty, O'Reilly & Mark
5
6
7
8
9              C O N T E N T S
10
11         EXAMINATION OF TOUFIC MELKI, M.D.
12             By Mr. Gowen .......... 4
13
14
15             E X H I B I T S
16          (Attached to original transcript)
17  T. MELKI DEPOSITION EXHIBIT        PAGE
18  1  Investment Report .......................... 82
19  2  Investment Report (SEP IRA) ............... 82
20  3  Operating Agreement ...................... 91
21
22

**Page 4**

1              P R O C E E D I N G S
2                 TOUFIC MELKI, M.D.,
3      having been duly sworn, testified as follows:
4          EXAMINATION ON BEHALF OF PLAINTIFF
5  BY MR. GOWEN:
6      Q.  Good afternoon, Dr. Melki.
7          You have been deposed before, so you
8  understand the general procedures of a deposition?
9      A.  Yes.
10     Q.  If at any point you want to take a break,
11  just say so and we can take a break.
12         If there is any answer today that you are
13  not sure of, and you become sure of that answer at a
14  later date, I am going to ask you to provide that
15  answer to me through your attorney.
16         Will you agree to do that?
17     A.  Um-hum; yes.
18     Q.  Okay.  We provided you with a notice for
19  this deposition, an amended notice for this
20  deposition, that asked you to bring certain
21  documents with you.  It's my understanding that you
22  do not have any documents to produce today?

17

1 practice then?

2     A. The OMIC insurance; we have insurance.
3 They hired a lawyer in Annapolis. I am blocking on
4 his name, but I had Paul O'Reilly also, like, be a
5 consultant. I did not trust that lawyer, and it was
6 the right decision to make.

7     Q. Okay. In 2018, this current year, has your
8 practice hired a lawyer?

9     A. Besides Paul or Klayssen, the one we
10 mentioned?

11     Q. Well, has your practice hired Paul in 2018,
12 this current year?

13     A. It's not a matter of hiring. He is my
14 attorney prior to meeting even Bart. I never filed
15 him to hire him again. He is an ongoing attorney.

16     Q. Has your practice paid Paul in 2018?

17     A. Yes; and that would be the payment to Bart.
18 They work together. If you see Paul O'Reilly, it's
19 going to Bart. That would be my opinion.

20     Q. Okay. Is there anything that the practice
21 would have paid Paul O'Reilly for other than this
22 divorce case?

18

1     A. No; not in the last – since that lawsuit
2 and I hired him, that I recall. The answer is no.

3     Q. Okay. And what about --

4     A. So, instead of making a transfer from 279
5 to 647, it's easier sometimes to just pay from 279
6 to Bart. We have a big bill, a huge bill.

7     Q. What is your bill right now?

8     A. It's probably over 60,000, and I have been
9 paying constantly.

10     Q. In 2017, did your practice pay any legal
11 fees that you can remember, other than for this
12 divorce?

13     A. In 2017, that I paid this firm, Paul
14 O'Reilly?

15     Q. Not you, did your practice; or any lawyer.

16     A. Please say it again; I got interrupted.
17 I'm sorry.

18     Q. No problem. Has your practice...did your
19 practice in 2017 pay any other lawyer for any legal
20 matter, other than for this divorce?

21     A. Yes; probably, yes. Because, like I told
22 you, if I have Klayssen, that attorney for, like,

19

1 contracts and stuff like that; if I have a question,
2 she will review something.

3     I had that employee. He wanted to do some-
4 thing – leave for a while and come back, leave --
5 so she ran the contract. So, different matters that
6 would...yes; so the answer is yes.

7     Q. And, on average, if you think about 2016
8 and 2017, how much would you say your practice
9 spends on legal fees that are just for the practice,
10 not for you personally?

11     A. To be honest, I don't know.

12     I don't recall all of these things because
13 I am, like, overwhelmed with this, with the divorce
14 issue. It is really overwhelming. That's sort of
15 taking a lot of my energy and focus.

16     Q. Okay.

17     A. You can look at my taxes; you have the
18 taxes.

19     Q. Talking about the marriage...tell me about
20 your marriage to Cynthia. You believe it was
21 official because it was in the church.

22     What church was it?

20

1     A. The church in Tripoli, St. George.

2     Q. And what kind of church is that?

3     A. It is a Greek Orthodox Church.

4     The Father Sarrouj is our priest.

5     Q. Okay. And as part of that ceremony, did
6 you and Cynthia sign any documents?

7     A. Yes. There is the marriage certificate.

8     Q. And was that marriage -- did you sign any
9 documents with the church?

10     A. Correct. Under the church in Lebanon, you
11 marry in the church, and it's only recognized, the
12 church marriage. You don't recognize -- there is no
13 such thing as civil marriage. So, we married in the
14 church. And, yes, we have documents and everything.

15     Q. And how many documents did you sign?

16     A. Probably two; one or two documents.

17     Q. And what were those documents?

18     A. The marriage certificate. You have to,
19 like, sign the papers. If you do a civil one, you
20 have a civil paper. If you have a marriage in a
21 church, you sign the papers in the church.

22     Q. Okay. And so, these papers, was it -- so

21

1  you said you signed two documents. It was either
2  one or two documents; you are not sure?
3      A.  I am not sure; in 2009, June 21.
4          We can make that available to you.
5      Q.  And you have that document?
6      A.  Not on me.
7      Q.  But you have it in your possession?
8      A.  Yes.
9      Q.  Okay.  And is it just one document, or is
10  it two documents?
11     A.  I have to look and see.
12         In Lebanon, they have a lot of papers, so I
13  will see.  Whatever I have, I will share with you.
14     Q.  Now, do you contest -- what is your
15  position on -- do those documents dictate when
16  someone can be divorced or how someone can be
17  divorced?
18     A.  No, no; they don't talk about law.
19         But we have -- they call it canon law, and
20  the Orthodox Church has laws for divorce.
21         And no fault divorce is not accepted.
22     Q.  And does this document state that, state

22

1  that this marriage is under the canon laws?
2      A.  No; but it's under the church.
3          So, yes, I do have documents to say that
4  this marriage will not be granted a divorce based on
5  this condition of no fault --
6      Q.  And --
7      A.  -- from the church.
8      Q.  And do you believe that you and Cynthia
9  were legally married in the United States?
10     A.  We never did any marriage.  We did not do
11  any ceremony or anything, or any -- did not go into
12  the courthouse.
13         And we did not -- no; the answer is not.
14     Q.  I see.  Did you fill out any documents as a
15  United States -- are you a United States citizen?
16     A.  Yes; by birth.
17     Q.  And did you fill any documents out in the
18  United States claiming to be married to Cynthia?
19     A.  Oh, yes, of course; if that's what you
20  mean.
21     Q.  And you file tax returns as...you claim you
22  were married on tax returns?

23

1      A.  Sure.
2      Q.  Do you believe you have a legal American
3  marriage?
4          MR. COLOMBO:  Objection.
5      A.  I don't know what you mean by that.
6  BY MR. GOWEN:
7      Q.  What do you think I mean?
8          MR. COLOMBO:  Objection.
9      A.  I am married.  We are both married, and we
10  married in Lebanon as Lebanese citizens.
11         And we also happen to be dual citizens.
12  BY MR. GOWEN:
13     Q.  Is it your position that when you and
14  Cynthia married, you both made an agreement that you
15  would marry her in exchange -- that she would marry
16  you, and in exchange you would provide money to her
17  and her family?
18     A.  No; never like that.
19     Q.  Do you believe that any of Ms. Melki's
20  actions would make this divorce illegal?
21         MR. COLOMBO:  Objection.
22     A.  Her actions make the divorce illegal?

24

1  BY MR. GOWEN:
2      Q.  Yes.
3      A.  I don't understand the question.
4      Q.  Okay.  What law do you believe should
5  govern this divorce?
6          MR. COLOMBO:  Objection.
7  BY MR. GOWEN:
8      Q.  Lebanese or American law?
9      A.  Lebanese, of course.
10     Q.  And why is that?
11     A.  Because we got married in Lebanon, and we
12  promised each other we would die all together, and
13  for better and for worse.  And I am against divorce
14  from every single fiber in my body.
15         When you have a family, you sacrifice for
16  the children, and you resolve and you work hard to
17  resolve the problems.  When you have someone
18  disappear on you, this is totally unacceptable.
19         I will repeat it, I will say it now, and
20  say it until I die:  there will not be a divorce,
21  she is married to me until I die.
22         So, she has to kill me to get the divorce.

57

1  A. Do we have a postnuptial?

2  Q. Do you know what I mean?

3  A. Do we have a postnuptial?

4  We don't have a postnuptial.

5  Q. Okay. Do you believe you have -- sorry.

6  Do you have any agreement that is similar

7  to either a prenuptial agreement or a postnuptial

8  agreement?

9  MR. COLOMBO: Objection.

10  A. I don't understand the question.

11  We don't have a prenuptial, and we don't

12  have a postnuptial.

13  BY MR. GOWEN:

14  Q. Okay. Do you have any sort of contractual

15  relationship...do you have any other either contract

16  or agreement with Cynthia regarding your marriage?

17  MR. COLOMBO: Can I ask if it's a written

18  contract as opposed to an oral agreement?

19  THE WITNESS: We have an oral agreement the

20  day that we got married that we would never, never

21  hear the word "divorce."

22  This is like the basic...why I waited 49

58

1  years to find a Lebanese woman that we would marry

2  and have similar culture, a Christian background,

3  and we would never get a divorce.

4  I'm allergic to the word "divorce."

5  BY MR. GOWEN:

6  Q. I will try not to use it.

7  A. Okay.

8  Q. I don't want you to break out in hives.

9  So, there is no written agreement between

10  you and Cynthia regarding ending your marriage?

11  A. Okay. No; the answer is no.

12  Q. But there was an oral agreement?

13  A. That we would not end it until we die.

14  Q. And when was that oral agreement made?

15  A. That's when we were engaged and...before

16  June, six months prior to June of 2009. That was,

17  sort of, multiple discussions and understanding and

18  coming to common grounds. There was an accepted

19  thing. We have common grounds.

20  We see alike. We have lots in common and

21  Christian background, et cetera. The culture is

22  similar, and the proof is in the pudding. We have

59

1  three blessed children. They don't come from

2  fighting, they don't come from hitting; they come

3  from love.

4  Q. This oral agreement; was there a specific

5  oral agreement, or is what you are saying is over

6  time you discussed, sort of, having shared values?

7  Or, was there a specific oral agreement

8  that you would say is a contract?

9  A. When two people meet and they agree they

10  want to get married, it's a big thing. It is the

11  most important thing of someone's life on a personal

12  level. So, we agreed. We talk about different

13  subjects, and we agreed on different things and the

14  children and everything, and the religion, and the

15  different views and different aspects, upbringing.

16  So, this is all kind of in the premarital

17  talks. We came to an agreement and culminated in

18  marriage. But there is no paperwork, if you are

19  looking for paperwork, unless you have something

20  that I don't know of.

21  Q. Did you make an agreement with her father

22  to marry her?

60

1  A. Well, it is a custom we go and ask for --

2  the culture is we go and ask for her hand, and the

3  family goes and my father talked.

4  And then...so everybody was in agreement

5  that we are going to get married. I promised him

6  that we will support her career because it is a joy.

7  I help people see, and she helps people be

8  happy from the singing. Sort of we are both helping

9  people be happy.

10  So, I promised him that I will support her

11  career, and I did. It was weekly for seven years,

12  for 21,000 and change of instructions and voice

13  lessons.

14  Q. And did her father say that his blessing to

15  marry his daughter was conditional on you paying

16  $21,000 a year?

17  A. No. I am just giving you this as an added

18  bonus. I gave you the summary.

19  Q. Now, you mentioned that you had a nanny and

20  a cleaning person?

21  A. No; it was the same person, but she would

22  do either/or.



DEFENDANT'S
EXHIBIT
2

**1**

1  IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND
2  CYNTHIA MELKI,
3      Plaintiff,
4  v.        Case No. 138142-FL
5  TOUFIC MELKI,
6      Defendant.
7      Friday, May 18, 2018
8      North Bethesda, Maryland
9
10     DEPOSITION OF CYNTHIA SAMAHA MELKI
11
12      The deposition of CYNTHIA SAMAHA MELKI was
13  taken on Friday, May 18, 2018, commencing at 10:03
14  a.m., at the law offices of O'Reilly & Mark, P.C.,
15  11200 Rockville Pike, Suite 405, North Bethesda,
16  Maryland 20852, before RANDY T. SANDEFER, RPR,
17  Stenotype Reporter and Notary Public in and for the
18  State of Maryland.
19
20
21
22

**3**

1  ALSO PRESENT (Alphabetically):
2      Toufic Melki, M.D., Defendant
3      Mr. Nick Poz, Gowen Silva & Winograd
4      Ms. Judith St. Ledger-Roty, O'Reilly & Mark
5
6
7
8              CONTENTS
9
10
11     EXAMINATION OF CYNTHIA SAMAHA MELKI
12        By Mr. Colombo ........ 5
13
14
15
16
17
18
19
20
21
22

**2**

1  APPEARANCES:
2
3  On behalf of the Plaintiff:
4      CHRISTOPHER J. GOWEN, ESQ.
5      Gowen Silva & Winograd PLLC
6      513 Capitol Court, N.E.
7      Suite 100
8      Washington, D.C.  20002
9      (202) 408-5400
10     cgowen@gowensilva.com
11
12  On behalf of the Defendant:
13     BART COLOMBO, ESQ.
14     O'Reilly & Mark, P.C.
15     21 Main Street
16     P.O. Box 305
17     Round Hill, Virginia 20142
18     (703) 442-4165
19     bcolombo@oreillymark.com
20
21
22

**4**

1              EXHIBITS
2         (Attached to original transcript)
3  C. MELKI DEPOSITION EXHIBIT          PAGE
4  1  Account statement (0820), 9/13/2016 ....... 73
5  2  Account statement (0820), 1/11/2017 ....... 85
6  3  Account statement (0820), 3/14/2017 ...... 86
7  4  Account statement (0820), 10/12/2017 ...... 88
8  5  Financial statement ...................... 94
9  6  Check number 1152 ...................... 133
10 7  Check number 1005 ...................... 134
11 8  U.S. Treasury check, 3/24/2017 ......... 135
12 9  Check number 2070 ...................... 136
13 10 State of Maryland check ................. 137
14 11 U.S. Treasury check, 10/25/2017 ......... 138
15 12 Check number 232 ...................... 138
16 13 Check number 1281 ...................... 139
17 14 Check number 109 ...................... 141
18 15 Check number 112 ...................... 142
19 16 Check number 130 ...................... 142
20 17 Check number 135 ...................... 143
21 18 Check number 170 ...................... 143
22

5

PROCEEDINGS

CYNTHIA SAMAHA MELKI,

having been duly sworn, testified as follows:

EXAMINATION ON BEHALF OF DEFENDANT

BY MR. COLOMBO:

Q. Good morning, Ms. Melki.

A. Good morning.

Q. I know you have already been deposed before because I have taken your deposition before.

Would you just state your full name and current address.

A. Cynthia Samaha Melki; and I live in 120 Gibbs Street, Unit 347, Rockville, Maryland 20850.

Q. Have you taken any drugs or medication in the last 24 hours that would impair your ability to understand my questions and answer them truthfully today?

A. No.

Q. Are you under a doctor's care at the moment?

A. No.

Q. What is your date of birth?

6

A. 9/19/1983.

Q. So, how old are you?

A. Thirty-four.

Q. And you married Dr. Melki on June 21, 2009; is that right?

A. Correct; yes.

Q. And that was in Tripoli, Lebanon?

A. Correct.

Q. And that was a church wedding?

A. Yes.

Q. In which church?

A. St. George, Tripoli.

Q. What faith?

A. Orthodox.

Q. Orthodox; is it Greek Orthodox, or is it just Orthodox Christianity? Do you know?

A. Yes. In Lebanon we have Orthodox, Catholic, and we have Maronite.

So, I think it is Greek Orthodox.

Q. All right. But it is definitely Orthodox?

A. Yes.

Q. Were you brought up in the Orthodox faith?

7

A. No; I am Catholic.

Q. You were brought up Catholic?

A. Yes.

Q. Did you convert to Orthodox at some point?

Was there, like, a formal baptism or anything like that?

A. No.

Q. All right. I'm sorry; go ahead.

A. Just to let you know that in Lebanon, we only have, like, religious -- if we want to marry in Lebanon, it's religious; either Islam or Christian.

Q. So, there is no civil ceremony as we would have here?

A. Yes; correct.

Q. And just remember -- I haven't instructed you because we have done this before, but one thing to keep in mind is that only one of us can talk at a time. So, let me finish my question, and I will let you finish your answer.

And the other is that you have to answer with "yes" or "no" rather than saying "um-hum" or "uh-uh"; things like that?

8

A. Yes.

Q. Okay. Great. So, you were brought up in the Catholic faith in Lebanon?

A. Correct.

Q. Now, when you married Dr. Melki, that was pursuant to the Orthodox faith? This church you married in was an Orthodox church?

A. Correct.

Q. Okay. And when you got married, did you agree to follow the canons of the Orthodox Church?

Was that part of the ceremony?

MR. GOWEN: Objection to the form.

A. No.

BY MR. COLOMBO:

Q. No? There wasn't anything in the ceremony about the marriage being pursuant to the Orthodox faith?

A. I don't recall that.

Q. You don't recall; okay.

The marriage was certainly pursuant to Lebanese law. Would you agree?

MR. GOWEN: Objection to the form.

9

1  A. I don't know.
2  BY MR. COLOMBO:
3  Q. You don't believe it was a legal Lebanese
4  marriage?
5  MR. GOWEN: Objection to the form.
6  A. I don't know.
7  BY MR. COLOMBO:
8  Q. All right. Do you have any reason to
9  believe it wasn't?
10  A. I can't think of anything now.
11  Q. Do you still consider yourself today to be
12  Catholic, or do you consider yourself to be
13  Orthodox, or something else?
14  A. For me, there is no difference between both
15  of them. My mom was Orthodox -- is Orthodox, and my
16  dad is Catholic, and I have no difference between
17  those. I love both of them.
18  Q. Do you still attend a church?
19  A. Yes.
20  Q. Which church do you attend?
21  A. I go to St. Peter and Paul, the Orthodox.
22  I go to Our Lady of Lebanon, the Maronite.

10

1  I go to the Catholic...
2  Q. You attend all different churches?
3  A. Correct.
4  Q. Regularly?
5  A. It depends on my schedule, but, yes, I try
6  my best.
7  Q. So, do you attend church weekly?
8  A. It depends on the month. It depends on
9  what I have, if I am busy, if I am not.
10  Q. Do you go by yourself, or do you go with
11  the children?
12  A. Sometimes by myself. Sometimes the
13  children are with their dad, so I go by myself.
14  Sometimes with the children.
15  Q. And when you have the children, you have
16  taken them to church at churches other than the
17  Orthodox Church?
18  A. Sometimes.
19  Q. What other churches have you taken them to
20  for services?
21  A. Sometimes we went to -- they have their
22  school, the Episcopal School. So, sometimes I take

11

1  them. It's very close to our house, to the church
2  on Sundays. And sometimes I take them to the
3  Orthodox Church, St. Peter and Paul.
4  Q. Have you taken them to the Maronite church?
5  A. I don't recall. But during the marriage,
6  yes, I took them to the Maronite church.
7  Q. Since the separation?
8  A. I don't remember; I don't think so.
9  Q. When you married Dr. Melki, did you tell
10  him at the time that you were an Orthodox believer?
11  Do you understand my question?
12  A. No.
13  Q. Just before you and Dr. Melki were married,
14  when you were engaged, did you tell him that you had
15  become a believer in the Orthodox faith?
16  A. No.
17  Q. Was that ever discussed?
18  Was the religious issue ever discussed
19  between the two of you?
20  A. No. He told me that he is Orthodox, and he
21  knew that I am Catholic, and we have to respect each
22  other. Actually, there is no big difference between

12

1  both of them.
2  Q. Okay. So, I guess it would be fair to say
3  you are still religious?
4  A. Yes.
5  Q. And when you married Dr. Melki, you were a
6  Lebanese citizen?
7  A. Correct.
8  Q. And you still have your Lebanese citizen-
9  ship?
10  A. Yes.
11  Q. Do you know what the Orthodox teachings are
12  with respect to marriage and divorce in Lebanon?
13  Are you familiar with them?
14  A. Kind of.
15  Q. All right. So, pursuant to those
16  teachings, when is a divorce permitted?
17  A. When you can't live with each other any-
18  more, and somebody is taking a big pull on the other
19  person. So, the divorce is permitted.
20  Q. So, would it be fair to say that there has
21  to be a reason in order to get divorced in the
22  Orthodox faith?

13

1     **A.** I am not an expert in that.

2     **Q.** Based on your understanding.

3     **A.** I know that they respect human beings and

4 they respect -- they care for a person and their

5 sanity. So, I believe...yes, that comes to mind.

6     **Q.** All right. Is there such a thing, to your

7 knowledge, as a no fault divorce in the Orthodox

8 faith?

9     **A.** As I told you, I am not an expert.

10     **Q.** Sure. That's why I said "to your

11 knowledge."

12     **A.** No, I don't know.

13     **Q.** You don't know?

14     **A.** No.

15     **Q.** Is there such a thing as a no fault divorce

16 under Lebanese law, to your knowledge?

17     **A.** Also, I don't know.

18     **Q.** All right. Again, this is just prior to

19 your marriage, did you and Dr. Melki discuss your

20 future plans with respect to where you would live?

21     **A.** Yes. He mentioned many times constantly

22 that he was going to stay in the United States only

14

1 for two years, and then come back to Lebanon.

2     **Q.** So, that was the plan?

3     **A.** Yes, but...

4     **Q.** And you agreed with that?

5     **A.** I was fine, because I am from Lebanon.

6     **Q.** Is it fair to say that's something you also

7 wanted to do, live in the United States temporarily

8 and then return to Lebanon?

9     **A.** I wouldn't -- I can't plan anything

10 because, first of all, I am not from here to decide

11 I am going to live in the United States or in

12 Lebanon, back then. So, I was coming here to see --

13 I didn't know the country.

14     I came because of marrying him.

15     **Q.** I understand that. But I guess you stated

16 that Dr. Melki told you that the plan was to go to

17 the United States, and then return to Lebanon after

18 two years.

19     **A.** Um-hum.

20     **Q.** Yes?

21     **A.** Yes.

22     **Q.** And you agreed with that; correct?

15

1     **A.** Yes.

2     **Q.** All right. And was there any discussion

3 between you and Dr. Melki -- again, at that time --

4 regarding where you would live in Lebanon, which

5 property, or whether you would acquire a property in

6 Lebanon?

7     **A.** He told me that he has a townhouse in

8 Lebanon that he would -- he used to stay in the

9 townhouse when he was in Lebanon.

10     And in summer -- that's what he told me,

11 that he has another house in the Dahr Sawan, in the

12 mountains.

13     **Q.** Can you spell that.

14     A. D-A-H-R; then a space, Sawan, S-A-W-A-N.

15     **Q.** Okay. So, was it your understanding that

16 when you returned to Lebanon after two years or so

17 in the U.S., that you would live in one of his town-

18 houses?

19     **A.** No. He was talking also about building a

20 house on the beach land, something like this.

21     It wasn't that clear. I wasn't making

22 everything clear, like where I am going to live.

16

1     **Q.** All right. And was there a discussion

2 about having children, and where the children would

3 be raised?

4     **A.** Yes.

5     **Q.** And what was that?

6     **A.** What?

7     **Q.** What was the contents of that discussion?

8     **A.** That we both wanted children, and we love

9 children, so...but he wanted to raise them in

10 Lebanon.

11     **Q.** And how did you feel about that?

12     **A.** I was fine with it.

13     **Q.** All right. Were there any negotiations

14 between your family and Dr. Melki, in the context of

15 the engagement, for the payment of any money or any

16 type of support in exchange for your marrying him?

17     Do you understand --

18     **A.** No.

19     **Q.** Do you understand the question?

20     **A.** Can you repeat it better?

21     **Q.** Sure. Like a dowry or something like that.

22     Was there any discussion from your family,

Tripoly Kourah
Et
Dependences
Teleph 06 442364 -65



to whom it may concern.

i undersigned father ibrahim sarrouj pastor of st georges cathedral in tripoli lebanon,

certify that we have been waiting the coming of our spiritual son dr Toufic Melki and finally he arrived this Christmas 2017, to his homeland with his 3 children. it happened that I baptized his first born child Najwa and when I knew that his 3rd child Anthony was Not Baptised yet, I insisted that he should be baptized before his return to the u s. this is what we have done on the 2nd of january 2018.

i knew from Dr. Melki that he insisted on his wife cynthia to come with him from the us to assist at the ceremony. as he incisted on her parents to be present as well, he did buy a ticket for Cynthia's mother Rajaa to come with him & the children . cyncia has been more than one year outside her matrimonial house. despite of this dr milki is still incisting on saving his conjugual life.

we are ready to do anything to achieve this goal.

father ibrahim sarrouj

tripoli on the 6th of january 2018

in the Orthodox Church laws , cynthia will Not be granted the divorce based on "No Fault". We will work hard towards reunion of this blessed Marriage.

*Tripoli on the 12th of January 2018*

*Father Ibrahim Sarrouj*

Republic of Lebanon
Ministry of Interior
Directorate General of the Civil Registration

**Marriage Certificate**

| HUSBAND | | | |
|---|---|---|---|
| First name | Tonio SHUKRI | Full name of the wife | Carine SAMARA |
| Father's name | BUTRUS/BOTROS to BOTROS | Place of date of birth (DD/MM/YYYY) | ZAHLE, County of ZAHLE, 10/10/19.. |
| Mother's name | Salim | Father's name | Tanos |
| Occupation | Nawfal/CHIKHANFI | Mother's name | Rajaa NASRALAT |
| Religion or province | | Occupation | Greek Catholic |
| Registration place | Greek Orthodox | Religion or province | Single |
| | | Registration place | ZAHLE, County of Zahle |
| | ZAHLEH, County of ZAHLE | | |

The Greek Orthodox Archdiocese of TRIPOLI, KHURA, and their Dependencies ... under no. 41/201.. Tonio SHUKRI, on 09/23/2009

Place and date of marriage: ZAHIEH, County of ZAHLE, ...

...

This document is presented to the Registration office of TRIPOLI ... Color Oct 17, 2019 under no 1118

A true copy of the original issued on 17/11/2019

The Civil Registrar of Tripoli
Khader H. ANSARI
Signed K. ANSARI
...

FAMILY CIVIL STATUS RECORD
Citizen of TRIP
District: TRIPOLI
Employee Rank & No: ZABITA 217

| Partner's Name | Partner's full name | Place & date of birth (DD/MM/YYYY) | Status | Marital Status | Sex | Remarks, Date of registration |
|---|---|---|---|---|---|---|
| Father | | | Greek Orthodox | married | M | |
| Tamny | Female SAADAT | Arabic on 25/12/1953 | Greek Catholic | married | | registration 25/12/1953 |
| | Cyntia SAADAH | VIRGINIA on 15/4/2000 | Greek Orthodox | minor | | born 15/4/2000 |
| Father | Cyntia SAADAH | VIRGINIA on 27/5/2002 | Greek Orthodox | minor | M | born 27/5/2002 |
| Tania | Cyntia SAADAH | VIRGINIA on 25/8/2004 | Greek Orthodox | single | F | born 25/8/2004 |

The Civil Registrar of TRIPOLI

Rrabee' E. ASSLAC

(signed & sealed)





1

The Civil Status law and Code of Procedure of the Greek Orthodox Patriarchate of Antioch and the Rest of the Levant





2

Each of the spouses is entitled to own and dispose independently of his/her assets, unless the two spouses have agreed contrarily upon the marriage conclusion or in a separate contract.

Article 29

Each financial agreement between the two spouses shall remain their own specific law and shall only be modified after the marriage by the agreement of both parties, and competent tribunals shall have the jurisdiction to examine any conflict arising therefrom.

Article 30

The movable assets belonging conventionally to the wife, as well as those she bought with her personal money or those of her parents, shall remain her property. While the remaining assets shall be considered those of the husband, unless it is proven contrarily.



3

## Chapter II

## Of marriage dissolution

### Article 67

The marriage shall be dissolved upon the request of one of the prejudiced spouses and upon a sentence rendered by the tribunal for the following causes:

1- If one of the spouses converted into another religion.
2- If one of the spouses tries to kill the other.
3- If one of them was sentenced to three years minimum of imprisonment for flagrant crime.
4- If one of the spouses has neglected the other one for more than three years, whether he/she was away from his/her residence or living in it and the Tribunal has not succeeded to convince him /her to return to matrimonial life, provided that the three years' time limit shall start to run once one of the spouses inform officially the Parish priest or the religious chief of the arising conflict.
5- If the tribunal has officially sentenced the separation for three years maximum and the efforts deployed for conciliation and returning to common life have not succeeded, provided that the prejudiced party files a new lawsuit.
6- If one of the spouses has intentionally refused, without the consent of the other, to procreate by any means or has abstained from sexual intercourse without justification or legitimate causes to be estimated by the tribunal.

### Chapter III- Of Divorce

### Article 68

Any of the prejudiced spouses is entitled to file for divorce for adultery or what is considered as similar to adultery provided submitting an evidence thereto, stipulating that the Tribunal decides upon what is similar to adultery.

### Article 69

Are considered as similar to adultery the cases mentioned below without limitation, and the husband is therefore entitled to ask for the divorce from the wife:

1- If he finds out that the wife is not a virgin, unless he knows about her before the marriage. Therefore, he shall submit the case immediately to the concerned religious chief with proofs.

2- If the husband has repeatedly asked his wife not to patronize a place or people with bad reputation and she didn't comply.

3- If the wife, without obtaining the approval of her husband, has slept in a suspicious place, except when her husband has expulsed his wife outside the home, by force or as a result of violence he committed against her. In this case, she is entitled to resort to the house of her parents or one of her female cousins. In case she has no one to recourse to, she shall go to a safe non suspicious place.

4- If the tribunal has condemned her to follow her husband to his place of residence and she refused that, or in case the tribunal has condemned her to return to the matrimonial house and has specified a time limit for her to return and she didn't comply without submitting an acceptable excuse.

5- If the sexual perversion of the wife is proven.



4

## Article 70

Are considered as similar to adultery the cases mentioned below without limitation, and the wife is therefore entitled to ask for the divorce from the husband:

1- If the husband prejudices his wife's chastity, by facilitating act of adultery and insisted on her against her will, or has committed anal sex to her.
2- If he has claimed that she committed adultery without submitting proof.
3- If the sexual perversion of the husband is proven.
4- If the wife has repeatedly asked her husband not to patronize a place or people with bad reputation and he didn't comply.



5

The Sacred Council has approved this law on his meeting held in BALAMAND on 10/16/2003, and his Beatitude the Patriarch has taken in charge its publication.

Aghnatios the fourth

Patriarch of Antioch and the Rest of the Levant

# EXHIBIT "C"

Metropole Grecque Orthodoxe
De
Tripoli, Koura
Et
Dependences
Teleph 06442264 -65

To whom it may concern.

I, the undersigned, Father Ibrahim Sarrouj, priest of St. George Cathedral, in the archdiocese of Tripoli, Koura and Dependencies, certify that our spiritual son, Dr Toufic Mikati, is married to Cynthia Samaha, on the 21 of June 2004, according to the rites of our Orthodox Church of Antioch and the whole East. It happened that I was the main priest who celebrated the ceremony.

Upon request this certificate was issued

Tripoli 3rd of April 2013

Father Ibrahim Sarrouj

# EXHIBIT "D"

بحث في الوصف

| Date | CourtId | DepId | bookId | catId | typeId | title | Id |
|---|---|---|---|---|---|---|---|
| 11/29/1988 | استئناف جبل لبنان | - | الوصية والارث والاحوال الشخصية | احوال شخصية | مدني | 4 - - طلاق: زواج مدني في فرنسا للبنانيين مارونيين - زواج ديني لاحق - اختصاص - اختصاص تشريعي - اختصاص - قواعد القانون الدولي الخاص - قاعدة المحل بسود العقد من حيث الشكل - خضوع الشخص في احواله الشخصية لقاعدة الوطني - اهمال نية الفريقين - نص الزامي - انتظام عام - تطبيق القانون المذهبي المارونى غير الراضين للرابطة الزوجية كما حصلت في الخارج - استثناء - تطبيق القانون الاجنبي - المادة 25 - فقرة 2 من القرار 60 ل. ر. - شروط اختصاص قضائي - المادة 79 ا. م. م. - تفسير - اختصاص القضاء المذهبي لا المدني | 5282 |

4- طلاق: زواج مدني في فرنسا للبنانيين مارونيين - زواج ديني لاحق - اختصاص - اختصاص تشريعي - اختصاص - قواعد القانون الدولي الخاص - قاعدة المحل بسود العقد من حيث الشكل - خضوع الشخص في احواله الشخصية لقانون الوطني - اهمال نية الفريقين - نص الزامي - انتظام عام - تطبيق القانون المذهبي المارونى غير الراضين للرابطة الزوجية كما حصلت في الخارج - استثناء - تطبيق القانون الاجنبي - المادة 25 - فقرة 2 من القرار 60 ل. ر. - شروط اختصاص قضائي - المادة 79 ا. م. م. - تفسير - اختصاص القضاء المذهبي لا المدني: في الاختصاص: حيث انه مما لا خلاف عليه ان احدى الفريقين انهما اجريا زواجا مدنياً بتاريخ 30/4/1981 اعقبه بزواج ديني ماروني بتاريخ 2/5/1981 في البلد نفسه. وحيث ان الزوجة المستأنفة تطعن في الحكم الابتدائي الذي قضى برد الدعوى لعدم الصلاحية معتبرة ان الزواج لا يخضع لاحكام القانون الكنسي وبالتالي يعود الاختصاص للمرجع المدني مدلية بالاسباب التالية: ان المادة 79 اصول مدنية تنيط امر النظر بالمنازعات الناشئة عن عقد الزواج الحاصل في الخارج بين لبنانيين أو بين لبناني واجنبي بالشكل المدني المقرر في قانون ذلك البلد بالمحاكم المدنية اللبنانية وتستثنى من ذلك فقط اللبنانيين المسلمين. واستطراداً وعلى فرض ان النية تصلح اساساً لتحديد القانون وجب التطبيق فان النية الحقيقية التي تصرفت لدى الفريقين في اعتماد القانون المدني الفرنسي وليس القانون الكنسي. واستطراداً فان اعتماد الزواج الديني فقط يوجب اعلان بطلان الزواج المدني وازالة اثاره وبالتالي شطبه من قيود الاحوال الشخصية وهذا الامر يدخل ضمن اختصاص القضاء المدني وقد اغفلت المحكمة الابتدائية النظر في هذا الطلب الاستئنافي. وحيث انه يقتضي تحديد نطاق تطبيق المادة 79 اصول مدنية لجهة اختصاص القضاء المدني بالمنازعات الناشئة عن زواج اللبنانيين المعقود بالشكل المدني في الخارج وبالتالي معرفة ما اذا كان هذا الا شاملاً مطلقاً ينعقد حتماً لمجرد وجود زواج مدني في الخارج ام انه اختصاص استثنائي يعمل به احتياطاً عند تعذر تطبيق الاحكام العامة او الصلاحية في مسائل الاحوال الشخصية. وحيث انه قد يقال ان النص اذ ورد طلاقاً والمطلق يترك على اطلاقه ما لم يرد عليه استثناء يحد من نطاق تطبيقه وان هذا ما جعله مشرع المادة 79 اصول اذ حصر الاستثناء بالمسلمين اللبنانيين فقط. وحيث انه الا يصح الركون الا في هذا الاثر ذلك الذكر لان تحديد نطاق تطبيق النص لا يقتصر على المدني وانما يتوافر ذلك توخياً لتفسير الكامل الى الاحاطة بالنظام القانوني للموضوع الذي يندرج النص تحت عنوانه ويدخل ضمن اطاره لان النص لا يولد في فراغ تشريعي ومن هنا جاءت القاعدة الفقهية المتعلقة بتفسير النص العام تشير الى ان الدليل على التقييد لا يقتصر على النص انما يستفاد من الدلالة ايضاً (يراجع بهذا المعنى المادة 64 مجلة الاحكام العدلية التي نصت على انه المبدأ يقوم بقولها المطلق يجري على اطلاقه اذا لم يقم الدليل على التقييد نصاً او دلالة). وحيث انه واستناداً الى التحليل الآنف الذكر يقتضي فهم نطاق صلاحية القضاء المدني وفي هذا الشان باعتماد تفسير يؤمن التكامل والانسجام بين النصوص والمبادئ القانونية التي ترعى موضوع زواج اللبنانيين في الخارج. وحيث انه ينفي الاشارة بادئ ذي بده الى ان الموضوع يثير نزاعاً حول القانون وجب التطبيق على اساس النزاع وبالتالي حول المرجع الصالح لفصله الامر الذي يجعل الترابط قائماً بين مسألتي الصلاحية التشريعية والصلاحية القضائية في هذا الشان وبستدعى بحثهما معاً. وحيث ان القضية تثير عنصراً اجنبياً وكان العقد على الاقل متداخلاً ضمن مبلحة القانون الدولي الخاص ويقتضي بالتالي دراستها في اطار النصوص والمبادئ المعتمدة في لبنان ضمن حقل هذا القانون. وحيث انه وفيما عني بموضوع البحث من المسلم به في هذا القانون بالنسبة للبنانيين وفي حقل القانون الدولي الخاص ان المرء يخضع في احواله الشخصية لقانونه الوطني وان العقد يخضع من حيث الشكل لقانون محل انعقاده اعمالاً لقاعدة المكان يسود العقد. وحيث انه وتطبيقاً للمبادئ آنفة الذكر يخضع زواج اللبنانيين اينما يحصل لاحكام قانونهم الوطني الا في ما ورد عليه استثناء وهذا ما كرسته واكدته المادتان 10 و24 من القرار 60 اذ نصت على انه فيما عدا الاستثناء المنصوص عليه في المادة 25 يكون لاغياً ولبس له مفعول الزواج المحتفل به. وحيث ان المادة 25 نصت على ما يلي: اذا عقد في بلد اجنبي زواج بين لبناني واجنبي... كان صحيحاً اذا احتفل به وفقاً للاشكال المتبعة في هذا البلد. اذا كان نظام الاحوال الشخصية التابع له الزوج لا يقبل بشكل الزواج ولا بمفاعيله كما هي ناتجة عن القانون المحتفل بالزواج وفقاً له فيكون الزواج خاضعاً... للقانون المدني. وحيث انه يستفاد من نص المادة 25 آنفة الذكر الاستثناء التاليان: ان شكل الزواج المعقود وفقاً لشريعة اجنبية يعتبر صحيحاً وبالتالي يقتصر تطبيق القانون الاجنبي على شكل الزواج المعقود في الخارج فان اذا رفض الزواج المعقود في الخارج من قبل نظام الاحوال الشخصية التابع له الزوج يلجأ كمرجع احتياطي الى القانون المدني. وحيث انه يستفاد مما تقدم ان المشترع اللبناني اعتمد من حيث المبدأ احكام القانون الدولي الخاص التي يخضع زواج اللبنانيين لقانونهم الوطني او لجهة القول بصحة شكل الزواج الحاصل في الخارج وفقاً لاحكام البلد الذي تم فيه الا انه راعى استثناء الخصوصية اللبنانية من حيث كون نظام الاحوال الشخصية في لبنان هو نظام تعددي طائفي فاستدرك ما يلي: عدم اخضاع المسلمين اللبنانيين لاحكام القرار 60 تاريخ 1936 وتعديلاته. اخضاع الزواج الحاصل في الخارج والمرفوض من قبل نظام الاحوال الشخصية التابع له الزوج لاحكام القانون المدني. وحيث ان ما تجدر ملاحظته من التدقيق بنص الفقرة الثانية من المادة 25 آنفة الذكر هو ان المشترع لم يخضع الزواج المرفوض لاحكام القانون الاجنبي الذي تم في ظله لاحكام القانون المدني. وحيث انه يقتضي في فهم هذا الاستثناء اعتماد التفسير الذي يفهم اصلاً بعبارة القانون المدني اللبناني اي انه يقصد بهذه العبارة ما وردت في تحديد النصوص من القرار 60 - تراجع المواد 10 و14 وما يليها من هذا القرار. وحيث انه بالنظر لافتقار التشريع اللبناني الى تشريع مدني في موضوع الزواج كان لا بد من اللجوء الى اعتماد الحل القائل بتطبيق احكام قانون محل اجراء العقد على شكله واساسه.

L'alinéa précité dispose que le mariage sera régi, au Liban par la loi civile, mais c'est une règle qui tombe dans le vide quisqu'une telle loi sur le mariage n'existe pas au Liban. Et l'on ne saurait

pour combler la lacune, faire appel à une loi communautaire Libanaise puisqu'une telle loi ne serait pas un loi civile, elle ne pourrait pas reconnaitre la validated'un mraiage intéressant ses ressortissants conclu en une autre forme que la sienne. Pour sortir de l'impasse et éviter un déni de justice il ne reste plus que le moyen de donner competence, quant aux conditions de fonds et aux effects du marriage, à la loi de celebrations. Tyan dr. int. privé éde. 66 page 165 et s.

وحيث انه ينبني على ما تقدم القول بأن تطبيق القانون الاجنبي على زواج اللبنانيين الحاصل في الخارج هو استثناء على المبدا ومقيد بشرطين ينبني توفرهما معاً... اقتنار التشريع اللبناني الى نظام زواج مدني ورفض الزواج من قبل نظام الاحوال الشخصية التابع للزوج اللبناني وهو ما يحصل عادة اذا اقتصر الامر على انفراد العقد المدني. وحيث انه يمكن تطبيق القانون اللبناني مدنياً كان ام طائفياً على زواج اللبنانيين المعقود في الخارج الا اذا تعذر هذا الامر كما في حالة الرفض الملحوظة في نص المادة 25 آنفة الذكر. وبالتالي فانه اذا توفرت امكانية تطبيق القانون اللبناني فلا مجال للحديث عن اي قانون آخر ويقتضي اعمال المبدا القائل بخضوع الاحوال الشخصية للقانون الوطني. وحيث ان المسألة ليست مسألة مفاضلة بين قانون وآخر وانما هي مسألة تطبيق نصوص قانون توفرت شروط اعماله. وحيث انه لا يصح القياس على النص القائل بوجوب تطبيق احكام قانون الطائفة التي تم امامها الزواج الاول في حال تعدده لأن النص يتحدث عن عقدين امام مرجعين لبنانيين من جهة وولانه من حيث المبدا يخضع الزواج لاحكام القانون الوطني وان تم وحصل امام مرجع اجنبي ووفقاً لصيغة الا اذا وجد نص يستثني من ذلك الحكم. وحيث انه لا يجوز البحث في استظهار النوايا توسلاً لتحديد القانون ولجب التطبيق على عقد الزواج ومفاعيله لأن قانون عقد الزواج يستمد من عناصر ومعطيات تعدى مبدأ سلطان الارادة ـ ذلك ان عقد الزواج بتمتع بخصائص مميزة تقربه من دائرة النظام القانوني وعليه تعتبر كافة الادلة المساقة استظهاراً لنوايا الفريقين في حكم النافلة بما في ذلك مسألة التسجيل. C'est un acte complexe, c'est un acte règle (colin - capitant dr. civ. Page 66. caratères au contrat de marriage). وحيث ان احكام المادة 16 من قانون 2 نيسان 1951 التي تحصر البطلان بالزواج المدني الحاصل في لبنان لا تتعارض مع المبدا القائل بأن الزواج المدني المعقود في الخارج يخضع لاحكام القانون المدني لأن اخضاعه لاحكام القانون الوطني لا يشكل الغاء للرابطة الزوجية او ابطالاً لها باعتبار ان الرابطة الزوجية واحدة وان تعددت العقود (instrumentum) فالعقد واحد (Negotium). وحيث ان تنظيم الاحوال الشخصية بمقتضى نصوص الزامية يشكل خرقاً لحرية المعتقد لأن هذه الحرية تقف عند حدود النصوص الالزامية والمتعلقة بالنظام العام. وحيث انه وفي الحالة الراهنة فان اجراء عقد الزواج امام المرجع المدني وتأتياً امام المرجع الديني يجعل الرابطة مقبولة من نظام الاحوال الشخصية التابع له الزوجان معاً فيخضعها لسلطانه وبالتالي تنتفي الحاجة والضرورة من اخضاعها للقانون المدني الاجنبي كحالة وحل استثنائيين وذلك عندما يحصل الزواج المدني في الخارج منفرداً ويستبدق مبدأ حكم القانون الشخصي في الاحوال الشخصية سيادته على الموضوع لائه الاصل. وحيث انه يقتضي فهم المادة 79 اصول مدنية في سياق النصوص المتعلقة بالاساس آنفة الذكر وهي في الواقع ثأتي منسجمة مع مضمون القرار رقم 60 عموماً والمادة 25 منه خصوصاً. وحيث ان المادتين 25 و 79 آنفتي الذكر تعالجان موضوعين مختلفين فالاولى تتحدث عن الصلاحية التشريعية والثانية تتعلق بالصلاحية القضائية. وحيث انه ولئن اختلف الموضوعان فانهما يترابطان من ناحية ان النزاع المحكوم بقواعد مذهبية فيدخل ضمن اختصاص القضاء المذهبي وهذا الحل اعتمده الفقه والاجتهاد قبل وضع نص المادة 79 اصول جديدة. فجاءت هذه المادة مركبة الحل السابق. وحيث ان ما يؤكد انسجام المادة 79 مع نصوص القرار 60 وتعديلاته انها راعت هذه النصوص من حيث قولها بوجوب مراعاة اختصاص المحاكم الشرعية والدرزية باعتبار ان القرار رقم 60 لا يطبق على المسلمين الامر الذي يفيد ان صلاحية القضاء المدني في مسائل الزواج تتعقد عندما يدفع الاختصاص في اساس النزاع لقانون مدني. وحيث انه وباعتبار الزواج القائم بين الفريقين خاضعاً لاحكام قانون الاحوال الشخصية للطائفة المارونية فان النظر بمفاعيله يعتبر خارجاً عن اختصاص القضاء المدني لجهة طلب القول بانعدام عقد الزواج المدني او بطلانه وبالتالي شطبه من قيود الاحوال الشخصية. استئناف جبل لبنان ـ رقم 114 تاريخ 29/11/1988.

EXHIBIT "E"

# الأخبار

# الطلاق الكنسي لا يُعفي من الطلاق المدني

عدل | الجمعة 18 تموز 2008

عقد كل من جوزيف وسيلفانا زواجهما في مدينة لارنكا القبرصية عام 1990، وفقاً لأحكام القانون المدني القبرصي. وبعد عودتهما إلى لبنان، تزوجا كنسياً وفقاً لطقوس الطائفة المارونية، ثم سجّلا زواجهما في دوائر الأحوال الشخصية اللبنانية. إلا أن تبدّل طباع الزوج جعل من استمرار الزواج بينهما أمراً مستحيلاً، فكان الانفصال في عام 2002، حين سافر جوزيف إلى أوستراليا، وبقيت سيلفانا في لبنان.

وبما أن الزوجين عقدا قرانهما لدى جهة مدنية وأخرى كنسية، صار لزاماً عليهما أن يُبطلا الصيغتين. فتقدّمت الزوجة بدعوى بطلان زواج أمام المحكمة الروحية المارونية التي قضت بمطلبها بحكم صدر في عام 2007. ثم عادت وطلبت إعلان الطلاق المدني سنداً لمواد القانون القبرصي، وهو ما رأت محكمة الدرجة الأولى في جبل لبنان، الغرفة الثالثة الناظرة في دعاوى الأحوال الشخصية، أنه يدخل في اختصاصها «لأن إبطال الزواج من المرجع الروحي المختص، ليس من شأنه أن ينزع من اختصاص المحكمة المدنية أمر النظر في طلب فسخ عقد الزواج المدني».

ولفتت المحكمة إلى أن عقد الزواج المدني يختلف عن الزواج الكنسي من حيث طبيعته ونشأته ومفاعيله، وبما أن الزواج تمّ بصيغتين مختلفتين، وجب مقاربة كل صيغة على حدة. وبما أن مؤسسة الزواج المدني ترعاها قواعد مستقلة، فإنه يعود فقط للمرجع المدني أن ينظر في قضاياها ما دام قانونه هو الذي يرعاها منذ نشأتها ولحين انقضائها.

ورغم أن المادة 79 من قانون أصول المحاكمات المدنية تولي المحاكم اللبنانية اختصاص النظر في المنازعات الناشئة عن عقد الزواج الذي تمّ في بلد أجنبي بين لبنانيين، فإن القانون المستوجب التطبيق على الزواج القائم هو ذلك الذي يرعى الزواج والطلاق في قبرص، الذي أُدرج تحت الفصل 52 من الدستور.

من ناحية أخرى، وبما أن سيلفانا وجوزيف أكّدا أنهما منفصلان منذ أكثر من خمس سنوات، ومع تحقق الشروط القانونية والواقعية للانفصال، قضت محكمة الدرجة الأولى في جبل لبنان، الغرفة الثالثة في جديدة المتن، الناظرة في دعاوى الأحوال الشخصية، والمؤلفة من الرئيس جون القزي والقاضيين آلاء الخطيب وناجي الدحداح، بإعلان طلاق سيلفانا وجوزيف في الزواج المدني المعقود مدنياً في قبرص.

(الأخبار)

# Exhibit 4

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

```
------------------------------X
                              :
CYNTHIA MELKI,                :
                              :
        Plaintiff,            :
                              :
            v.                :        Family Law No. 138142
                              :
TOUFIC MELKI,                 :
                              :
        Defendant.            :
                              :
------------------------------X
```

MERITS TRIAL

Rockville, Maryland                        November 1, 2018

DEPOSITION SERVICES, INC.
12321 Middlebrook Road, Suite 210
Germantown, Maryland 20874
(301) 881-3344

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

```
------------------------------X
                              :
CYNTHIA MELKI,                :
                              :
          Plaintiff,          :
                              :
               v.             :        Family Law No. 138142
                              :
TOUFIC MELKI,                 :
                              :
          Defendant.          :
                              :
------------------------------X
```

Rockville, Maryland

November 1, 2018

WHEREUPON, the proceedings in the above-entitled matter commenced

BEFORE:    THE HONORABLE CYNTHIA CALLAHAN, JUDGE

APPEARANCES:

FOR THE PLAINTIFF:

CHRISTOPER J. GOWEN, Esq.
Gowen, Silva, & Winograd, PLLC
513 Capital Court Northeast, Suite 100
Washington, District of Columbia 20002

FOR THE DEFENDANT:

SUSAN J. RUBIN, Esq.
Law Office of Susan J. Rubin, LLC
50 West Montgomery Avenue, Suite 105
Rockville, Maryland 20850

28

1   our traditions, and you know, we're going to live, you know,

2   for better, for worse, for the rest of our lives.

3          And, and so she insisted she's not coming to the U.S.

4   on a fiancé visa, and I agreed with her, and she, I mean, she

5   is, you know, conservative family, and they don't want, you

6   know, what if I change my mind if we come to the U.S.

7          I'm not going to, you know, end up with their

8   daughter being, you know, I'm saying, so they, we both agreed

9   that this is the right thing to do and, in our religion, and

10  I'm strict about that, that there is no divorce when there is

11  no fault.  There's no such thing.  We have to work for the sake

12  of these three innocent children.

13     Q    Okay.  Dr. Melki, how soon after your marriage did

14  you come back to the United States?

15     A    How --

16     Q    How soon after the marriage ceremony, did the two of

17  you return to the United States?  Did you come back together?

18  Let me ask it that way?

19     A    Okay.

20     Q    Did you come back together?

21     A    Well, yes.  What, but when I got married, we got

22  married in June 21st, and then we apply to the U.S. Embassy to,

23  you know, because she is not a U.S. citizen, and so we applied

24  as married couple.  That helped significantly versus the fiancé

25  visa.

58

1   Ms. -- who's on that mortgage, do you know?

2       A    Who own, I am the, I'm the, I carry the -- it's not a

3   mortgage; it's a home equity loan.

4       Q    I see.  So, let me ask you a very simple question,

5   sir.  Have you used the money on that home equity loan, a

6   HELOC, do you know the word HELOC?

7       A    Yeah.

8       Q    I'll call it a home equity loan, maybe it's easier.

9   The home equity line, is that $245,000, for what use is that

10  money made of on the HELOC?  What do you use that HELOC for?

11  What was the purpose of getting the HELOC?  Let me rephrase it.

12      A    It's, it's a 10-year, it's a 10-year loan that's just

13  last year finished the 10 years.  So, from 2007 to 2017 was

14  open.  You use it as you wish.  So, part of it maybe for the

15  remodeling of the house.  Some of it when I needed money to

16  send to this mortgage.  That I used all the properties, every,

17  everything, every single property I have, every credit I

18  extended to pay my 1.6 million loan.

19      Q    Okay.

20      A    That was a huge burden on me.

21      Q    Thank you.

22          MR. GOWEN:  Objection.  Not --

23          THE COURT:  Sustained.  And I'm going to strike the

24  part about the loan.

25          MS. RUBIN:  Okay.

1            BY MS. RUBIN:

2        Q    14?

3        A    Yes.  Yes, I can.  It's the financial statement

4    submitted in August.  Yes.

5        Q    Okay.  And so I'd like to go through this with you,

6    sir.  At the current time -- please, let's look at page 1.

7    Now, this is listed as the primary residence, and is that the

8    residence you're currently living in, sir?

9        A    Yes.

10       Q    So, that's Edge, is it Edgewood or Edgewater?

11       A    Edgewood Drive.

12       Q    Edgewood Drive.  Okay.  And is that mortgage for

13   $1,953, is that your mortgage, sir?

14       A    It's the Citibank home, the HELOC.

15       Q    Okay.  And so that wouldn't include taxes and

16   insurance, correct?  It's just the HELOC --

17       A    It's the HELOC.

18       Q    -- correct?

19       A    No.  Taxes are extra.

20       Q    Okay.  And is that insurance number right?  Who do

21   you have home insurance with?

22       A    I didn't hear the question.

23       Q    Who do you have your home insurance with?  Who is the

24   carrier of your home insurance, sir?

25       A    Oh, it's called Liberty Mutual.

# Exhibit 5

## In the Circuit Court for Montgomery County, Maryland

Cynthia Melki
)
Plaintiff
)
vs.
)   Civil no. 138142-FL
)
Toufic Melki
)
Defendant
)
)

| Children | Date of Birth/Age | Children | Date of Birth/Age |
|---|---|---|---|
| N.M. | 8 | | |
| S.M. | 6 | | |
| A.M. | 3 | | |

| | Mother | Father | Combined |
|---|---|---|---|
| **1. Monthly Actual Income-Before Taxes** | 2500 | 30000 | 32500 |
| a.Minus pre-existing child support payment actually paid | 0 | 0 | |
| b.Minus alimony actually paid | 0 | 0 | |
| c. Plus/minus alimony awarded in this case | 9000 | -9000 | |
| **2. Monthly Adjusted Actual Income** | 11500 | 21000 | 32500 |
| **3. Percentage of Shared Income** | | | |
| Apply line 2 combined to Child Support Schedule | 35.4% | 64.6% | |
| **4. Basic Child Support Obligation** | | | 7321 |
| a. Work-Related Child care expenses Code FL,12-204(g) | 0 | 1800 | 1800 |
| b.Health Insurance Expenses Code FL,12-204(h)(1) | 0 | 490 | 490 |
| c. Extraordinary Medical Expenses Code FL,12-204(h)(2) | 0 | 0 | 0 |
| d. Cash Medical Support,Code, FL, 12-102(c)(3)(ii) | 0 | 0 | 0 |
| e. Additional Expenses | 0 | 3542 | 3542 |
| **5. Total Child Support Obligation** | | | 13153 |
| **6. Each Parents Child Support Obligation** | | | |
| (line 3 times line 5) | 4656 | 8497 | |
| **7. Recommended Child Support Obligation** | 0 | 8497 | |
| a. Income apportioned credit/debit from line 4. | 0 | -5832 | |
| **8. Recommended Child Support Order** | | 2665 | |

Comments or special adjustments, including any adjustment for certain third party benefits paid to or for the child of an obligor
who is disabled, retired, or receiving benefits as a result of a compensable claim (see Code, Family Law Article, §12-204 (j).

Prepared by:

Date: **4/5/2019**

Version 13.0 © SASI-CALC http://www.sasi-calc.com or email support@sasi-calc.com
Use of this form outside the SASI-CALC ™ program is expressly forbidden